Charlotte E. REINHEIMER and Clarence Reinheimer, Appellants-Respondents,

v.

Amanda RHEDANS and Margaret L. Cleeland, Respondents-Appellants.

No. 47091.

Supreme Court of Missouri, Division No. 2.

Sept. 14, 1959.

Motion for Rehearing or to Transfer to Court en Banc Denied Oct. 12, 1959.

Julius Berg, Clarence Neudeck, Francis R. Stout, St. Louis, for plaintiff Charlotte E. Reinheimer and third party plaintiff Clarence Reinheimer, appellants-respondents.

Donald S. Hilleary, St. Louis, for defendants Amanda Rhedans and Margaret Cleeland, appellants-respondents.

EAGER, Judge.

In one count of their second amended petition plaintiffs seek to set aside certain deeds as fraudulently induced and procured by defendant Rhedans, and in another they claim title by adverse possession and ask a declaration that defendants have no title. The property involved is a 30 foot vacant lot next to the home of plaintiffs in the City of St. Louis. The lot is described as "Lot 71 of the resubdivision of Block No. 5 of South St. Louis Suburb, and in City Block No. 2730 of the City of St. Louis and in subdivision now known as Grand Avenue Heights; * * " The house of plaintiffs is on Lot 70. Suit was originally filed on Aug. 30, 1956, by Charlotte Reinheimer; Clarence Reinheimer, her husband, was brought in as a necessary party on motion of defendants on April 12, 1957; thereafter he joined generally with the original plaintiff in her claims. In an amended counterclaim defendants claim title to the lot, pray an adjudication of the title, and also seek to hold Clarence Reinheimer liable upon his covenants of warranty for all judgments rendered against them. To digest the pleadings further would complicate this opinion unnecessarily. The issues will appear from the facts and from our discussion.

Clarence Reinheimer and defendant Amanda Rhedans are brother and sister; she was 76 years of age at trial time; his

age is not shown. Defendant Cleeland is Amanda's daughter, and is joined here because title to the lot was later put in the joint names of the mother and daughter. The source of title was Frederick Reinheimer, the father of Clarence and Amanda. Under date of Dec. 10, 1938, he conveyed Lots 70 and 71 to Clarence as "a single person"; this deed conveyed both the house and the controverted vacant lot next to it. Clarence had married in 1937 and there is much discussion, pro and con, as to whether the marriage had been kept secret. His wife Charlotte was a registered nurse and she continued to use her previous name, even to the time of trial; she testified that they told Clarence's father about the marriage within "a week or so," but there is little or no explanation of the fact that the father deeded the property as he did fourteen months later; she further testified that she was introduced to Mrs. Rhedans as Clarence's wife on April 30, 1942. The father died in 1940; under date of May 11, 1942, Clarence, designated as "a single person," purportedly executed and acknowledged a warranty deed to Lot 71 to his sister Amanda Rhedans as grantee. It is this deed, primarily, which is sought to be cancelled; the later ones are merely secondary. Plaintiff Charlotte testified that she first learned of the deed in July 1942, from a neighbor, but then "looked it up." Clarence testified: that he gave his father a note for $2,000 when the real estate was conveyed to him, and that he later paid this note to the estate; that the house was worth considerably more than that; that his sister had been asking him for a deed to the lot substantially ever since his father died, and told him that she had a paper or a note signed by their father stating that she should have the lot, but that she could not locate the paper. He further testified: that shortly before May 11, 1942, she told him that she had found the paper, so he proceeded to the office of a Mr. Panzier (who had been attorney for the father's estate and

who was dead at trial time) to have him prepare a deed to the lot; that Mr. Panzier was out, so he got from the office girl a warranty deed form which he signed in blank, leaving word that Mr. Panzier should complete it and that he would pick it up shortly; that he, Clarence, did not deliver the deed to his sister, nor did he acknowledge it in person (the acknowledgment was affixed by Mr. Panzier as of the date of the deed); that he learned later that his sister had picked up the deed; that he received nothing from her for the deed, in money or property. The fraud charged, so far as Clarence is concerned, rests in the fact that his sister picked up the completed deed without showing him any note or paper from his father. He further testified: that during May 1942 he asked his sister, by phone, for a return of the deed, the remainder of the conversation not being shown; that about 1947 his niece (Cleeland) came to his home and asked if his wife would sign a quitclaim deed, which she presented; that he did not let her in the house but went in and asked his wife if she would sign it; his excuse for this action was that he knew that the wife would not sign it. Clarence admitted receiving a deed from Mrs. Rhedans to a lot in St. Louis County, discussed later, but testified that he paid her $675 in cash for that deed in Mr. Panzier's office when he received it in October 1941.

Amanda Rhedans testified: that her father wanted Clarence to have the house and wanted her to have the lot; that she did not ask the father for a deed before his death because he was sick; that after his death she often requested a deed from Clarence but he wanted "pay" for the lot; that shortly before he went to an American Legion Convention in Boston in 1940, he gave to her at her house a signed paper stating that in case of his death the lot should be "given to my sister Mrs. John Rhedans on instructions from my father * * *." This paper

was offered as an exhibit and a photostat is here; Mrs. Rhedans testified that she (somewhat irregularly) had it notarized in the absence of Clarence, but with his consent. The brother's testimony about this instrument was rather equivocal; he stated that he guessed that it was his signature, that he did not remember signing it, that he did not know and did not remember whether he had prepared it, that his father never told him to give her the lot although she always insisted that the father had so intended, and he finally said that he never saw the paper before. Amanda further testified: that her father left three lots in St. Louis County and each of the three children was to have one; that the executors (one of whom was Clarence) deeded all three lots to her and charged them against her interest in the estate, promising to buy two of them back from her; that she finally conveyed one of these lots to Clarence as consideration for his deed to the lot here in controversy; her deed to him was dated and acknowledged on Oct. 27, 1941, but was not recorded until July 15, 1942. (The deed in controversy from Clarence to her, dated May 11, 1942, was recorded on July 20, 1942.) She also testified: that the deed to Lot 71 (here in controversy) was delivered to her by Clarence, and that they exchanged deeds at that time in his yard because he would not let her in the house; that Clarence had given her a computation (which she produced at the trial), claiming that she owed him money for taxes and interest, but that she did not understand this; that she finally agreed to "square it" by deeding him the lot in St. Louis County and getting his deed to Lot 71. Clarence, as stated, testified that he paid his sister $675 in cash for her lot. Amanda also testified that she did not know at the time of the exchange of deeds that Clarence was married, that she had seen Charlotte in the house about May 1st, but had not been introduced to her; that she had had little or nothing to do with Clarence

after their father's death, and that a relative told her about 1947 that he was married; that she then sent her daughter to see if she could get a quitclaim deed from his wife. She further testified: that she never told Clarence that she had a "paper" signed by her father, and that she never even attended a funeral at which Charlotte claimed to have talked with her about the lot; that she did not receive $675 or any other sum for the lot which she deeded to Clarence. Margaret Cleeland, Mrs. Rhedan's daughter, testified that about May 1942, Clarence introduced Charlotte as his "housekeeper."

Tax payments on the controverted lot were handled in a rather peculiar manner. Amanda Rhedans (or her daughter) paid the taxes for 1943-'44-'45 and '46 and produced receipts; she testified that after 1946 tax statements were refused for a time, they being told that the taxes had already been paid; that they also paid the taxes for 1953-'54-'55 and '56, and she produced the receipts. It seems that during the intervening years the plaintiffs had asked for statements and had paid the taxes; in fact, there seems to have been a sort of "scramble" for the right to pay taxes. However, the taxes were sometimes paid practically at the end of the year; for 1947 they went delinquent, being paid with the 1948 taxes on Dec. 23, 1948. The tax question is not deemed controlling.

On the plaintiffs' claim of adverse possession, the petition alleges that both plaintiffs had been in continuous and hostile possession for more than ten years, under a claim of right. Photographs were offered, showing, among other things, a fence between the lot and the house next door, a board fence at the rear of the lot, a little hedge in front, and a few rose bushes on the lot; plaintiffs testified that they had trimmed and sprayed the trees on the lot, picked fruit, removed dead and broken trees, cut the grass, planted flowers, constructed and main-

tained fences, and that they had always cared for the lot. Plaintiffs had taken down, within a matter of hours, a "For Sale" sign put up on the lot about 1948 or '49. Margaret Cleeland and her husband had dug and planted a small vegetable garden on the lot in the summer of 1943, but it was rather late and the lot was too shady, so nothing was produced but some radishes. Mrs. Cleeland testified that she saw Charlotte then, talked with her on two or three occasions, and that no objections whatever were made to their use of the lot. Charlotte did not deny the existence of the garden, but denied seeing the Cleelands there. We may note also, as of some significance on the question, the following: that when plaintiffs transferred title from the name of Clarence alone to their joint names in 1947, they transferred only the title to the lot which the house was on, and did not attempt to include the vacant lot; that on Feb. 25, 1948, Charlotte Reinheimer executed an affidavit, prepared for her by a lawyer, stating: facts to show an inchoate right of dower in the lot, the fact of the husband's conveyance without her consent or knowledge, and that she thereby served notice that she had "an inchoate Dower Right" in the lot. This affidavit was recorded on March 1, 1948; a copy was attached to the petition on which the case was tried. At the trial Charlotte testified that she had only claimed a dower right in the property and had not said that she owned it.

The trial court found and adjudged that the deed from Clarence to Amanda, and the two subsequent deeds which established a joint title in the defendants, were "technically fraudulent" and void in so far as they attempted to affect plaintiff Charlotte's marital rights; it found against plaintiffs' claim of adverse possession and rendered judgment on Count II accordingly; it found and adjudged title to be in the defendants, subject to Charlotte's "marital rights"; and it found

all "other issues" on defendants' counterclaim for plaintiffs, apparently referring to the claims on Clarence's covenants of warranty. From this decree all parties appealed, following the overruling of after-trial motions. Plaintiffs claim here that the court erred in not setting aside the deed from Clarence to Amanda as fraudulent and void in toto, and in failing to adjudge title in them by adverse possession. Defendants claim that Charlotte's inchoate right of dower was abolished by the new Probate Code, that the court erred in holding the deed void as to Charlotte's marital rights, that there was no fraud, that Amanda paid a valuable consideration for the deed, that the suit is barred by the Statutes of Limitation, and that plaintiffs wholly failed in their attempt to establish title by adverse possession.

Sections 474.110 and 474.150 Mo.Cum. Supp.1957, V.A.M.S., are (so far as material) as follows: "474.110. Curtesy and dower abolished.—The estates of curtesy and dower are hereby abolished, but any such estate now vested is not affected by this code."

"474.150. Gifts in fraud of marital rights—presumptions on conveyances.—1. Any gift made by a person, whether dying testate or intestate, in fraud of the marital rights of his surviving spouse to share in his estate, shall, at the election of the surviving spouse, be treated as a testamentary disposition and may be recovered from the donee and persons taking from him without adequate consideration and applied to the payment of the spouse's share, as in case of his election to take against the will.

"2. Any conveyance of real estate made by a married person at any time without the joinder or other written express assent of his spouse, made at any time, duly acknowledged, is deemed to be in fraud of the marital rights of his spouse

(if the spouse becomes a surviving spouse) unless the contrary is shown."[1]

■ There can be no doubt that the legislature has generally abolished the right or expectancy of inchoate dower; a measure of protection is afforded by section 474.150, but not as dower. This legislative action was effective on Jan. 1, 1956, prior to the filing of this suit. No question is raised here of the power of the legislature to so act. Inchoate dower is not a vested right. Chouteau v. Missouri Pacific Ry. Co., 122 Mo. 375, 30 S.W. 299, 300; Id., 122 Mo. 375, 22 S.W. 458; First National Bank of Stronghurst, Ill. v. Kirby, 269 Mo. 285, 190 S.W. 597; Borders v. Niemoeller, Mo.App., 239 S.W.2d 555. Compare Sando v. Phillips, Mo., 319 S.W.2d 648, 650. In return for the abolition of dower the widow has been given the rights by descent provided in section 474.010 and the exemptions, allowances and homestead rights provided by sections 474.250–474.300, inclusive. See: Comments of Simes, Model Probate Code § 31, p. 68. See, also, "New Probate Code," Judge Leslie A. Welch, 11 Mo.Bar Journal 145, 168; and, generally, 21 Mo.Law Review 151 et seq.

■ This brings us to the necessity of deciding whether the wife, Charlotte, has any rights here under section 474.150, supra. But, first, we shall consider the contention that Clarence's deed to his sister should be set aside in toto as fraudulently procured and without consideration. The issue of "undue influence," though pleaded, was in no sense developed. The trial court made no findings of fact, but it seems clear that it necessarily found the facts on this issue for the defendants, for it only found the deed "technically fraudulent" as to Charlotte's marital rights. The "fraud" which plaintiffs seem to claim is that Amanda picked up the deed from the lawyer's office without showing Clarence any "paper" from her father. It was not shown

how she knew it was there. In this test of credibility, so unfortunate between brother and sister, we have determined the fact issues for the defendants. We find from our independent examination of the record that Clarence delivered the controverted deed to his sister in exchange for her deed to the lot in St. Louis County; also, that he did not pay her, in cash or otherwise, for the St. Louis County lot. These deeds were recorded within five days of each other; there would have been no purpose in Amanda's holding Clarence's deed off the record from sometime shortly after May 11 until July 20, when she had been so anxious to get it for two years; nor would Clarence have been likely to hold up the recording of the deed to the St. Louis County lot for nine months, had it been delivered on or shortly after its date. Clarence had known for fourteen years prior to the filing of this suit that his sister had the deed, and he did nothing about it; in fact, he was brought into this case only on motion of the defendants. His actions now, after so long an acquiesence, are somewhat unseemly. We have considered on this contention all the facts mentioned elsewhere in this opinion; and we rule it adversely without further express consideration.

■ What we have thus determined also bears directly upon the charge that the deed was in fraud of Charlotte's marital rights. She had the expectancy of inchoate dower in the property until Jan. 1, 1956; thereafter she had no right in or claim upon that specific property unless the conveyance was in fraud of her marital rights, within the meaning of section 474.150, or otherwise. That section does not attempt to establish or create any new definition of fraud. See Comment to comparable Section 33 of the Model Probate, Simes, p. 73. It is the apparent purpose of subsection 2 to shift the burden of proof to the grantee to disprove fraud where real estate is conveyed by the husband alone without the joinder

---

1. The following words in section 474.150, subd. 2 (not material here) were added in the 1957 amendment (Laws 1957, p. 852): "joinder or other written * * * made at any time."

or written and acknowledged assent of his wife; the subsection was obviously written to compel joinders. Subsection 2 covers a broader field than subsection 1, in that the latter is confined to *"gifts"* in fraud of marital rights, whereas subsection 2 deals with all conveyances by a husband alone, presumably with or without consideration; but fraud is still necessary, as we construe the statute. It has been said, with reference to subsection 2, that: "It is probable, however, that if it is shown that consideration is given for the conveyance, the presumption as to fraud will be rebutted." Editorial Comment to this section in Vol. 26 V.A.M.S. We do not decide that here, but consideration is certainly a highly material element in dealing with conveyances questioned as in fraud of marital rights, and especially so under this statute. Here we have determined that a valuable consideration passed and that there was no gift; this presumably eliminates the application of subsection (1). We have also determined that no fraud against Charlotte's marital rights has been demonstrated, and that, if the burden be on defendants to disprove all such fraud, they have satisfactorily done so.

We have questioned whether the burden here is upon the defendants to disprove fraud because of the inclusion in subsection 2 of the parenthetical phrase "(if the spouse becomes a surviving spouse)," which puts some limitation upon the application of the subsection. Here Charlotte has not become a surviving spouse, her husband being still alive. This whole subsection was changed materially from Section 33(b) of the Model Probate Code. See Comments under this section in Vol. 26 V.A.M.S., and in Mo.Cum.Supp.1957. The parenthetical phrase is apparently original in Missouri. Our courts have not yet been required to decide whether, under this Code, a wife may sue to protect her marital rights while her husband is still alive. The Code, generally, contains no express limitation on or prohibition of this right, so far as we have found. We do not construe section 474.150 as an attempt to eliminate or limit the right

of a spouse to sue to set aside a deed for fraud at any time, if indeed the power of courts of equity to entertain suits of that nature may be limited by the legislature. Under the prior law a wife was permitted to sue in advance of her husband's death to protect her inchoate dower. Hart v. Parrish, Mo., 244 S.W.2d 105; Kober v. Kober, 324 Mo. 379, 23 S.W.2d 149; Vordick v. Kirsch, Mo., 216 S.W. 519. We deem it proper here to consider plaintiffs' case on the merits.

On the facts here we find no fraud as to Charlotte's marital rights; certainly there is an absence of the clear and convincing evidence usually necessary to invoke the extraordinary power to set aside a deed. Mueller v. Mueller, Mo., 318 S.W. 2d 365, 368. And the evidence as a whole disproves any and all such fraud, as we have already stated. It fairly shows that the deceased father wanted Amanda to have this lot, and told her so; her admitted conduct from the time of his death was consistent with that wish. It is conceivable that the facts here might have established a trust in Amanda's favor, but we certainly do not need to go into that. In attempting to get a deed from her brother from 1940 to April 30, 1942, Amanda could not possibly have been seeking to defraud his wife, for the latter date was the first time when even plaintiffs claim that Amanda was notified of the marriage. The brother finally acceded to Amanda's claim, but he stands here on the rather tenuous objection that she did not show him the "paper" from his father, and should not have received delivery of the deed; he has not very satisfactorily explained the exhibit purporting to be his own "paper," which directly refers to the father's wish. Clarence's deed was obviously made to settle a family argument between the brother and the sister, and not in pursuit of any scheme to defraud Charlotte of her marital rights. We do not find that the evidence fairly establishes the fact that Amanda knew of Clarence's marriage at the time she received the deed; that might not be material

under these circumstances, if true, for certainly the primary purpose of the deed was not to defraud Charlotte, and we have found consideration. We find that Amanda gave a valuable consideration for the conveyance of Lot 71, namely, the deed to her lot in St. Louis County. Plaintiffs do not suggest an inadequacy of consideration as constituting a fraud; they simply deny that there was any consideration, and assert that Clarence paid her, in cash, for that lot. We have found against that contention. Under these circumstances we do not need to compare values, or go into the adequacy of the consideration. There was some evidence that Clarence claimed that Amanda owed him money because he had given his father a note, and had paid interest on the note and taxes on the lot, as well as on his house. He did not claim, however, that the St. Louis County lot was transferred to him for this alleged debt, asserting that he paid in full for it; the status of the so-called debt is so vague, both factually and legally, that we hold it ineffective to invalidate the consideration passing to Clarence. There was no conveyance here in fraud of the marital rights of the wife.

Defendants have pleaded and briefed the bar of the foregoing claims by limitations. In view of our determination on the merits, it would be worse than useless to discuss that question.

■ There remains the contention of plaintiffs that they acquired title by adverse possession. Clarence's deed was made in and, as we find, delivered shortly after May 1942. Thereafter he and his wife lived in the home on Lot 70, and cared for the adjacent lot; they undoubtedly maintained some sort of possession of it, but there was nothing unusual about that, for it really was in the nature of an extension of their yard. Clarence, by his deed of May 11, 1942, divested himself of all ownership. He did not thereafter do anything which we construe as notice, actual or constructive, that he was then claiming title adverse to his grantee. As stated in Barada-Ghio Real Estate Co. v. Keleher, Mo., 214 S.W. 961,

962: "'The general rule is that, in order to make continuity of possession after the delivery of the deed the basis of an adverse holding, the grantor must, by words, acts, or conduct, apprise the grantee that he is claiming title and possession of the land against the covenants of his deed; for, until such notice is expressly or impliedly given to the grantee, he will be entitled to rest secure upon the legal presumption that the continued possession of the land by the grantor is in subservience to the grant. Meyer v. Hope, 101 Wis. 123, 77 N.W. 720; Stevens v. Whitcomb, 16 Vt. 121. But when the character of such possession is adequately changed, the grantee must recognize the altered status; for, if he permits the adverse possession to exist without cessation and without challenge for 10 years, the grantor maintaining it may be reinvested with the fee.' Rottink v. Nagle, 275 Mo. [196] 200, 204 S.W. [802] loc. cit. 803." See, also, Robinson v. Reynolds, Mo., 176 S.W. 3. It is not a mere occupancy or possession which must be known to the true owner to establish title by adverse possession, but one which is in opposition to his rights and in defiance of, or inconsistent with, his title. Hilgert v. Werner, 346 Mo. 1171, 145 S.W.2d 359, 361. Here, Clarence never really disclaimed his deed, nor did he during the following period of fourteen years claim actual title or exercise a possession so hostile to and inconsistent with defendants' rights as to constitute notice to them. In 1947 he even presented a quitclaim deed to his wife, without asserting his own title. The same may generally be said of his wife who admittedly learned of the deed in 1942. She did nothing which would constitute notice of a claim of ownership hostile to the deed. A conversation which she claimed to have had with Amanda in the spring of 1944 (denied by Amanda) could hardly have that effect, even if we gave it full credence. We regard the removal of the "For Sale" sign as not of sufficient consequence to be conclusive; and, significantly, no objection was made when defendant Cleeland and her husband planted a garden on the lot.

But so far as the wife's actions and claims were concerned (either as agent for both or for herself individually, if the latter be material) she appears to have been very consistent in claiming only a dower interest in the lot. She had a lawyer prepare an affidavit stating that the lot had been transferred to Amanda, that she claimed an inchoate right of dower therein, and that she thereby served notice of such right; she executed that affidavit on Feb. 25, 1948 (during the period when it is now claimed that adverse possession was running), and it was recorded very shortly thereafter as notice of her claim. At the trial she testified: "I said I had a dower right in it, I haven't said I owned it." For possession to ripen into title there must be an unequivocal claim of ownership. Bell v. Barrett, Mo., 76 S.W.2d 394; Mooney v. Canter, Mo., 311 S.W.2d 1; Landers v. Thompson, 356 Mo. 1169, 205 S.W.2d 544. And it has been said that: "Possession of land in recognition of a lack of title is insufficient ever to ripen into title by adverse possession." Riebold v. Smith, Mo.App., 150 S.W.2d 599, 602. A claim of dower not only falls short of a claim of unequivocal ownership or title, but it is inconsistent with such a claim. Charlotte's claim of dower here was a recognition of the existence of a presently outstanding fee title. We note further that when Clarence transferred the home to joint names in 1947, he made no attempt to include the lot in the transfers. This has been considered material upon a claim of adverse possession. Riebold v. Smith, Mo.App., 150 S.W. 2d 599, 602. So far as the taxes are concerned, it seems that plaintiffs first paid taxes on the lot in December 1948; even if that element be material (which it sometimes is) it could in no event be controlling here, for ten years did not run thereafter to the time of suit. The possession of plaintiffs here, such as it was, was entirely too equivocal to ripen into title by adverse possession. The trial court found against the claim, and its judgment therein is certainly not "clearly erroneous" under section 510.310. Title was not acquired here by adverse possession.

In their amended counterclaim defendants included a claim against plaintiff Clarence on his warranties; this has become largely moot. In any event, no statement of error in the trial court's judgment on that claim has been included in the "Points Relied On" in defendants' brief, and the matter is deemed abandoned. The judgment is reversed and the cause is remanded with directions to enter a judgment in accordance with the views stated herein.

All concur.