John G. RUSSELL and Vada S. Russell, Plaintiffs-Appellants,

v.

Francis H. RUSSELL and Hazel M. Russell, Defendants-Respondents.

No. 36185.

Missouri Court of Appeals, St. Louis District, Division Two.

Aug. 24, 1976.

Gordon F. Webb, Edwin Patrick Harrison, Jr., Clayton, for plaintiffs-appellants.

Richard A. Hetlage, St. Louis, for defendants-respondents.

KELLY, Judge.

This is an appeal from a judgment of the Circuit Court of St. Louis County sustaining defendants-respondents' Motion for a Directed Verdict at the Close of All of the Evidence and entering judgment quieting title to a nine acre parcel of land located at 8985 Dunn Road in St. Louis County in defendants-respondents. For reasons hereinafter stated, we affirm the judgment of the trial court but remand it for further proceedings to resolve issues still retained for further disposition dependent upon the outcome of this appeal.

John G. Russell and Vada Russell, the plaintiffs-appellants, are husband and wife as are Francis H. Russell and Hazel Russell, the defendants-respondents. John and Francis are brothers.[1]

This cause of action was instituted by Jack and Sue Russell by the filing of a petition in the Circuit Court of St. Louis County, Missouri, seeking to have title to the tract of land in issue declared to be vested in them pursuant to the provisions of § 516.010 RSMo. 1969. Harold and Hazel filed an Amended Answer, on which the cause came on for trial, wherein they alleged that they had acquired title to the

1. Where appropriate the parties shall be identified by the names used in the record, i. e., John G. Russell—"Jack"; Vada S. Russell—"Sue"; Francis H. Russell—"Harold"; and Hazel Russell—"Hazel".

tract in dispute by general warranty deed of June 14, 1948, which was duly recorded in the records of the Recorder of Deeds of St. Louis County and that appellants' possession of said tract from its inception until October 18, 1972, had been with their permission. They denied that the appellants had any right or title to the tract of land and further alleged that the appellants were, after October 18, 1972, tenants at will. They prayed that the trial court decree that the appellants had no title in the property and that the property was vested in them.

Respondents also filed a Counterclaim which they later amended. This Amended Counterclaim was in two counts. Count I sought a decree that appellants had no title to the parcel in issue, that the fee simple title was vested in the respondents and that they were entitled to possession thereof. They further prayed for an order that the appellants vacate the property and surrender it to the respondents and that they be given an order enjoining the appellants from interfering with their efforts to sell the property or from reentering same. Count II of respondents' Counterclaim sought actual damages in the amount of $1,000.00 and $7,500.00 punitive damages by reason of the appellants' "wilful and intended" refusal to deliver up possession of the premises.

Appellants filed a Reply to respondents' Answer, wherein they admitted that the respondents had acquired fee simple title to the real estate in issue by the deed dated June 14, 1948 and recorded in the office of the Recorder of Deeds of St. Louis County; the family relationships and that they were in possession; they denied the remaining allegations contained therein. As to Count I of respondents' Counterclaim, appellants after admitting the family relationships, denied that the respondents owned the property, admitted that they resided at 8985 Dunn Road, and denied the remainder of the respondents' allegations. With respect to Count II of the Counterclaim, appellants incorporated by reference the allegations contained in their Reply to Count I and denied the remainder of the allegations.

The cause was assigned to the Equity Division of the Circuit Court of St. Louis County whereupon the appellants filed a motion to remove the cause from the equity docket and assign it to a law division so they would be afforded a jury trial. This motion was sustained but was later reconsidered on motion of the respondents and reassigned to the Equity Division, "with leave to frame issues of fact for jury determination in pre-trial proceedings."

At a pre-trial conference the parties entered into a stipulation that there was no dispute as to the description of the property in issue; that the respondents were the grantees in a general warranty deed dated June 14, 1948, and recorded June 15, 1948 conveying to them the real estate in issue; that thereafter the respondents had not conveyed the property to any other person; that the appellants "went into occupancy" of the house on the real estate in the fall of 1948 and remain there; and that the appellants did not pay any rent to the respondents during the occupancy.

When the cause came on for trial, a jury was selected and sworn. After Instruction MAI 2.01 was read to the jury, the jury was excused for the day. Thereafter the trial court made a record wherein it stated that it had determined that the case should be tried to an advisory jury whose findings would be treated as conclusive should it later be determined that the case was one at law, or as merely advisory if it was one in equity. It was agreed by counsel and the trial court that any equitable issues would be reserved for further action by the trial court.

The next morning, after the jury had returned, evidence was adduced by the parties. No evidence, however, was adduced by either party on the equitable issues framed by the pleadings. At the conclusion of appellants' case and again at the conclusion of all of the evidence the parties presented to the trial court motions for directed verdict, and these were overruled. After all of the evidence was concluded, in

a conference out of the presence of the jury, the following took place.

"THE COURT: I want the record to show that after further conference with the attorneys we have agreed that we are taking the jury's verdict as a disposition of the legal issues, or issues under law in the case, as though this were a case tried at law. And we are reserving for further disposition and hearing, if necessary, any matters evoking the equitable jurisdiction of the Court as set out in the pleadings or if they are set out in the pleadings in the event that the jury returns a verdict for the defendant(s).

"Have I stated our position correctly, gentlemen?

"MR. HETLAGE: Yes.

"MR. HARRISON: Yes."

The jury was instructed, argument had, and the cause submitted to the jury on the issue of adverse possession alleged in the appellants' petition. After almost eight hours of deliberation the jury announced that it was unable to agree upon a verdict. The trial court declared a mistrial and discharged the jury.

Thereafter the respondents filed a Motion to reconsider their Motion for Directed Verdict and Entry of Judgment at the Close of All of the Evidence and for Entry of Judgment. Appellants likewise filed a "Memorandum" in opposition to respondents' Motion and prayed that the trial court set aside its order overruling their Motion for Directed Verdict at the Close of All of the Evidence and enter a Directed Verdict in Accordance Therewith or, in the alternative, to set the case for another trial by a jury as an action at law.

These motions were argued and submitted and after memoranda were filed by both parties, the trial court filed a memorandum and court order whereby it directed the respondents' attorney to prepare an appropriate judgment in accordance with the memorandum of the trial court settling all issues "on the claims and counterclaims of both parties, including an alternative decree should this case be ruled to have been in equity instead of at law."

Subsequently the trial court entered a decree overruling appellants' pending motions and sustained respondents' motion. The decree as entered adjudged that fee simple title to the land in controversy was vested in respondents and that the appellants have no right, claim, title or interest whatsoever in the real estate in issue. Alternatively, the trial court further decreed that if the cause be equitable in nature, that the respondents are vested with fee simple title to the real estate in issue and the appellants have no right, claim, title or interest whatsoever in the real estate in issue.

The appellants filed "objections" to this decree together with a Motion to Set Aside the Judgment and For a New Trial. Both of these motions were denied. This appeal followed.

In this court, the appellants contend that the trial court erred (1) in failing to find and rule that they were entitled to a jury trial; (2) in entering judgment in the alternative because the trial court thereby failed to determine the applicable scope of review on appeal; and (3) in granting respondents' after-trial motion for directed verdict.

As we comprehend appellants' first two contentions, they rely upon the alternative decree entered by the trial court and the argument that by casting its decree in the alternative the trial court said: "The case was tried to a jury, a mistrial was declared and 'I find that no submissible case was made and therefore judgment for the respondents.'" Thus, appellants' counsel argues, the trial judge never reached the question whether appellants were entitled to a jury trial. By this procedure the trial judge has denied appellants their right to a jury trial and has also failed to settle the scope of review on appeal.

From a reading of the record we believe it is clear that the trial judge was of the opinion that the adverse possession issue was one at law and for that reason prior to submission of the case to the jury he advised counsel for the parties that he was going to be bound by the facts found by the

jury on that issue. *Both counsel agreed to this.* While no specific order was entered to the effect that a separate trial was to be had on the quiet title part of the case as authorized by Rule 66.02, it is clear from the record that this is what was done when it was agreed that any equitable issues in the case would be reserved for further proceedings pending the outcome of the quiet title action. There were no equitable issues framed by the pleadings on this issue. Unless title was determined to be in respondents no equitable relief was sought, for unless respondents had the title as between the parties they would not be entitled to the injunctions they prayed for.

■ It is the settled law in Missouri that a quiet title action may be either at law or in equity according to the issues tendered by the pleadings. If the issues framed by the pleadings are basically equitable then the action lies in equity; however, where the issues are basically legal, the cause is at law and the parties are entitled to a jury trial unless they waive same. *Hatton v. City of St. Louis*, 264 Mo. 634, 175 S.W. 888 (Mo.1915); *Stafford v. Shinabargar*, 336 Mo. 856, 81 S.W.2d 626, 627[1] (1935). We believe that the trial court exercised its discretion and "in the furtherance of convenience" proceeded under Rule 66.02 to afford a separate trial by jury on the quiet title claims, reserving for later disposition those equitable issues raised in respondents' counterclaim Count I and the damages issues—which too are legal issues—raised in Count II thereof.

■ Having so elected, we likewise hold that the trial court did not err in entertaining the "after trial motions" filed by both parties pursuant to Rule 72.02.[2] This Rule provides that where a verdict was not returned following jury trial, a party, within fifteen days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict, and, simultaneously, a motion for new trial may be joined with this motion, or a new trial may be prayed for in the alternative. Both parties took advantage of this Rule, but on appeal the appellants inquire: "What is the method of decision for this court?" We respond to this question of appellants by referring to the rule that in determining whether a submissible case was made for a jury and whether the trial court erred in sustaining a defendant's Motion for a Directed Verdict at the Close of All of the Evidence, the plaintiff is entitled to have all of the evidence reviewed in a light most favorable to its theory of the case with the defendant's evidence being disregarded except insofar as it aids the plaintiff's case, and that the plaintiff is to be afforded the benefit of any and all reasonable inferences to be drawn from the evidence which is not in conflict with its theory of the case. *Wardenburg v. White*, 518 S.W.2d 152, 154[1] (Mo.App.1975). This is the scope of review to be afforded appellants' third point on appeal.

We find no merit in appellants' first two points.

In moving to appellants' third point we call attention to some basic rules of law applicable to quiet title actions where one of the parties seeks to establish title by adverse possession prior to setting forth the evidence in the case most favorable to the appellants' theory of the case.

■ Adverse possession of land for the required statutory period of time and the requisite character not only bars any action brought to recover such land or an interest therein, but also extinguishes the claimant's title and confers on the one in possession a full title in fee. *Moore v. Hoffman*, 327 Mo. 852, 39 S.W.2d 339, 343[14] (1931). The burden of proof as to the essential elements effective to constitute adverse possession is on the person claiming title through adverse possession. *Wilton Boat Club v. Hazell*, 502 S.W.2d 273, 276[5] (Mo.1973). "Where each party to a quiet title action is claiming title against the other, the burden of proof is upon the respective parties to prove better title than the other, and one party is not required to show a title good

against the whole world, but only a title superior to that of the other parties; a claimant must prevail on the strength of his own title and not upon any weakness in the title of the other claimants." *Moise v. Robinson,* 533 S.W.2d 234, 240[3] (Mo.App.1975). It is not a mere occupancy or possession which must be known to the true owner to establish title by adverse possession but one which is in opposition to his rights and in defiance of or inconsistent with his title. *Reinheimer v. Rhedans,* 327 S.W.2d 823, 830[8] (Mo.1959). The law presumes that every possession is rightful and consistent therewith; not in opposition or adverse to title and ownership. *Badger Lumber Co. v. St. Louis-San Francisco Ry. Co.,* 338 Mo. 349, 89 S.W.2d 954, 959[1] (1936).

The evidence, viewed in the light of the principles of appellate review stated supra, was that Louise Russell[3] was the mother of both Jack and Harold Russell. In addition to these two, she also bore two other children, Arthur C. and Dorothy R., both deceased at the time of trial. During her lifetime Mrs. Russell operated a floral shop and at divers times was helped by the children. At different times she gave portions of her estate to Arthur, Dorothy and Jack. To Arthur she gave a saloon, to Dorothy, money, and to Jack, a home. Harold took over the floral business and Mrs. Russell lived with Harold and Hazel in the family home on Kossuth Avenue in St. Louis, which Mrs. Russell conveyed to herself, Harold and Hazel. She died in 1947 and her estate was never probated because at the time of her death she had no assets. She handled her own affairs up to the time of her demise. At one point in time Mrs. Russell, Harold and Hazel joined in a deed conveying the home on Aldine Avenue to Jack and Laura Russell, his first wife, in consideration for which Jack executed a document whereby he relinquished any claim he might have on Mrs. Russell's estate. This first marriage of Jack's ended in divorce and he moved to Chicago, Illinois, where he married his present wife, Sue. In 1947 Jack experienced some financial difficulties and he wrote to Harold requesting that Harold lend him $200.00. Jack wrote Harold several letters bemoaning his plight and finally in one letter suggested to Harold that he, Jack, come back to St. Louis for awhile, "make a bunch of flowers and make them some money." Early in 1948 Jack came to St. Louis and he and Harold discussed Jack's going onto the Dunn Road property, building a house on it and raising evergreens on it. Title to the property was never discussed. He thought it was part of his mother's estate. Jack and his family returned to St. Louis and on or about September 1, 1948, he started building a house on the Dunn Road tract. Harold paid for the lumber and material which went into the construction of this house. Jack did 95% of the labor on the construction of a three room frame house, and Harold and one of Harold's chauffeurs did the balance. Sometime in October, 1948, Jack had a well dug at a cost of $36.00 and he paid for this. Harold paid for the pump which was placed on the well. Since then Jack has made other improvements on the tract. He has added two rooms, put in water, plumbing and some more electricity. About 15 or 16 years ago Jack built a shop, which he uses for welding and to make barbecue pits. He has farmed the property and on occasion has rented it to others to farm. He also rented a portion of the property for a concrete construction firm to park its construction equipment. He retained the rents for himself. He also permitted a policeman to erect a structure and keep his police dog on the property. In the early 1950's Hardesty & Johnson erected a sign advertising a subdivision—Lynn Haven—and he knocked it down the same evening it was erected. Sometime after this occurrence, Hauschulte Realty Co. and the Nooney Realty Co. erected signs on the property and he knocked them down also. Sometime in 1972 some men commenced removing some maple trees from the property and he ordered them off of the property.

There was also testimony by Jack and Sue that approximately three months after

---

**3.** The father of the family died in 1919.

he built the house Harold told him that he had a farm in Dexter, Missouri, which he would let Jack have if Jack moved off the Dunn Road property. Jack replied that he didn't lose a thing in Dexter, Missouri, and "You come and get me off." Also, sometime in 1950, Harold called him and asked him to help with the taxes. He replied that his wife was sick and he was in a bind and could not help. Again, at some later date, "the late 50's," Harold called Sue and asked her to talk Jack into taking a piece of property in St. Charles County and leaving the Dunn Road property. She conveyed this message to Jack.

At all times while the appellants occupied the Dunn Road property they were under the impression that it was part of Louise Russell's estate and Jack's share of her estate, until they received a letter sometime in September, 1972, from Mr. Hetlage, Harold's attorney, requesting that they surrender possession of the property. At different times prior to the receipt of the Hetlage letter, when appellants sought to make a loan, they represented to the lending agency that the Dunn Road property "was in my mother's estate." They testified that they never paid respondents any rent during the entire time they have occupied the property and that they paid neither taxes nor insurance.

Other witnesses produced by appellants testified that they were familiar with the fact that appellants lived on the Dunn Road property and had farmed it; that Jack maintained a welding shop on the premises. One witness, George R. Boyd, testified that Jack told him he owned the property. Another, Richard F. Cecil, appellants' tax man, testified that he prepared their income taxes, that he never took off any deductions for real estate taxes, and that on one occasion Jack told him he did not have to worry about paying any rent. Ralph Bastean testified that he rented six acres of the farm from appellants in 1972, farmed it, and paid the rent to appellants. Joseph Montrey testified that he has known appellants for thirty years or more and although Jack never told him that he owned the Dunn Road property he had the understanding from conversations around the tavern he owned that Jack's mother owned the property. Herman Kienstra, who has known the appellants since around the late forties or early fifties, testified that he furnished some ready-mix concrete, sand and cement to the premises several times through the years, and that some of this was used for the floor of the welding shop. Jack paid for this material. Jack told Mr. Kienstra that his mother owned the property.

Appellants also called as a witness their son, Ronald L. Russell, who testified that he had lived on the Dunn Road property for 18 years and during that time his father told him: "This is my property and this is my share of my mother's estate." While he lived on the property he observed his father tear down one sign which had been erected on the property and also saw his brother knock down another.

Jack admitted that he never advised Harold that he had destroyed the signs which had been erected on the land without his permission. Harold had been on the property only once in the last 23 years and the last time Jack saw Harold was seven years ago at Arthur's funeral. They did not discuss the property then. Until he received the letter from Mr. Hetlage in September of 1972 he did not know that Harold had a deed to the Dunn Road property. No one discussed his mother's estate with him at the time of her death nor immediately after; at some unspecified time he did discuss her estate with Arthur. On one occasion when he went to the Hazelwood City Hall to obtain a permit for a gas tank, he saw his mother's name on a document there. He testified that he knew deeds are recorded in the office of the Recorder of Deeds.

■ From appellants' evidence we believe it is clear that they entered upon the Dunn Road property in the belief that Jack Russell had an interest therein as an heir at law of Louise Russell; that this was "his share of his mother's estate." At no time did Jack testify that he believed the tract was his alone, or that the entire tract of land was his share of the estate, or that his

sister and brothers had no interest therein. Nor did he testify that he thought it was his share of the estate to the exclusion of the other heirs of Louise Russell. In effect, his own evidence was that he took possession and entered upon the property as a tenant-in-common with his sister and brothers. This is the theory upon which appellants tried their case, and an appellate court on appeal will not review a case upon a theory different from that upon which it was tried nisi. *Hulahan v. Sheehan*, 522 S.W.2d 134, 139[4] (Mo.App.1975). This belief that appellants occupied the property as tenants-in-common persisted until sometime in September of 1972, at which time, they learned for the first time that Harold Russell and his wife had a deed to the property when they were so advised by Mr. Hetlage's letter.

 The general rule is that a cotenant in possession presumptively holds possession for his cotenants and while he can acquire title by adverse possession against his cotenants, strong proof is required to overcome the presumption that the claimant holds possession for his cotenants. *Cash v. Gilbreath*, 507 S.W.2d 931, 934[3, 4, 5] (Mo.App.1974). However, for the statute to commence to run the cotenant in possession must evidence an unequivocal claim of ownership inimical to the rights of his cotenants which is so open and notorious as to manifest an intention to possess the property as his own and to exclude others from control and to ignore and repudiate any right in his cotenants. *Cash v. Gilbreath*, supra, l. c. 934[8]. It is not a mere occupancy or possession which must be known to those who claim ownership which establishes title by adverse possession, but that occupancy or possession which is in opposition to the rights and in defiance of or inconsistent with the rights of the other claimants. *Reinheimer v. Rhedans*, supra, l. c. 830[8]. Acts, verbal or otherwise, to show an adverse claim by a cotenant in possession, must be acts clearly repudiating and denying rights of the other cotenants. *Higgerson v. Higgerson*, 494 S.W.2d 374, 379 (Mo. App.1973). Until there have been such outward acts of exclusive ownership on the part of one cotenant as to impart notice, unequivocally, to his cotenant that an adverse possession is asserted against him the statute of limitations does not commence to run. *Zimmerman v. First National Bank of Brunswick*, 201 S.W. 852, 853[1] (Mo.1918). "The possession is not adverse until there exists in the mind of the possessor the intent and determination to hold the premises for himself, as of the time in question as well as of the future and to the exclusion of his cotenants, so as to render the existing possession hostile in fact. That is to say, the primary basic question is with what intent (quo animo) was the possession held as of the time in question." Anno. 82 A.L. R.2d Adverse Possession, § 9, p. 46.

 We hold that under the appellants' evidence they have failed to make a submissible case of adverse possession on the theory of law upon which they tried their case in the trial court for the reason that all of the acts they performed with respect to the property in issue as well as their verbal statements with respect to their interest in the property were consistent with their theory that they were tenants in common with the heirs of Louise Russell and did not constitute evidence of an unequivocal claim of ownership inimical to the rights of their cotenants so as to manifest an intention to possess the property as their own, to exclude their cotenants from control and to ignore and repudiate any right in the other cotenants.

We affirm, but remand this cause to the trial court for disposition of respondents' counterclaim.

CLEMENS, P. J., and STEWART, J., concur.