**Herman H. CORREALE, Alice Correale, and Karen Correale, Appellants,**

v.

**Michael HALL, Respondent.**

**No. ED 74738.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Oct. 5, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 5, 2000.

William Fortenbury, St. Louis, for appellant.

Louise R. Ryterski, St. Louis, for respondent.

KENT E. KAROHL, Judge.

Defendant Karen Correale is the daughter of defendants Herman and Alice Correale and, during part of the relevant period, she was the fiancée of Michael Hall (plaintiff).[1] Plaintiff filed a petition against Karen and her parents to establish a purchase money resulting trust in residential real estate located in St. Charles County. In a separate count against Karen and Herman, plaintiff alleged conversion of personal property having a value of $3018.74. In the petition's other counts, he alleged causes of action for quiet title, constructive trust, breach of contract, quantum meruit and breach of oral contract. The last three counts sought repayment of the value of improvements on real estate. The trial court heard the equitable proceeding, entered findings of fact and conclusions of law and a judgment in favor of plaintiff and against all defendants. The judgment impressed a resulting trust for plaintiff as a joint owner of a house and lot, known as # 5 Savoy, purchased in 1992 in the name of "Karen C. Correale" only. Defendants appeal the judgment recognizing a resulting trust. The court also entered judgment for plaintiff and against Karen and, perhaps, against Herman for conversion of personal property. The money judgment on the claim for conversion is not the subject of any points on appeal. It is affirmed. Two points on appeal argue the judgment recognizing plaintiff's one-half interest in # 5 Savoy, St. Charles County, Missouri, was not based on clear, cogent and unequivocal evidence to support finding: (1) he paid any consideration for the house; or, (2) there was any intent he have a specific interest. A third point argues, in the alternative, the court erroneously calculated the value of his interest, assuming he had an unspecified interest. The judgment on Count II was sufficient to reject plaintiff's alternative theories alleged in Counts I, III, IV, V and VI. The parties agree that we have jurisdiction to review a final judgment.

We adopt and incorporate the analysis of Missouri law regarding resulting trusts as it appears in the opinion of this court in *Dallas v. Dallas,* 670 S.W.2d 535 (Mo.App.1984). We need only highlight what was there said. "A resulting trust is implied by law from the conduct and acts of the parties and the circumstances and facts as they existed at and attendant to the transaction out of which the trust arose." *Dallas v. Dallas,* 670 S.W.2d 535, 539 (Mo.App.1984). A person claiming an interest based on a resulting trust must furnish, in part at least, some of the consideration for the conveyance to the title owner. *Id. citing Fulton v. Fulton,* 528 S.W.2d 146, 153 (Mo.App.1975). Thus, the general rule is that one who pays the purchase price for land titled in the name of another thereby creates the basis for a

---

1. We refer to the defendants/appellants by first name only, where applicable. We refer to plaintiff/respondent as "plaintiff," where applicable. We do this for readability only. We intend no disrespect to the parties.

presumption that the title owner holds an interest under a resulting trust for the payor. *Dallas,* 670 S.W.2d at 539 *citing Ravenscroft v. Ravenscroft,* 585 S.W.2d 270, 272–73 (Mo.App.1979); 2 Bogert, *Trusts,* section 454. However, "a resulting trust must arise, if at all, at the instant the deed is taken." *Dallas,* 670 S.W.2d at 539. Subsequent payments on a note are relevant only if at the time the note was given as part of the consideration, there was an existing understanding or obligation that the claimant would pay it. *Id.* (further citations omitted). Evidence pertaining to such agreement is relevant only to support finding an agreement or obligation to make payments on the note. A constructive trust may be found on the basis of an agreement or contract. In that respect it differs from a resulting trust, which is implied by law and is not based upon agreement or contract.

■ The claimant of a resulting trust must bear the burden of proving the claim by clear, cogent and convincing evidence. *Ellis v. Williams,* 312 S.W.2d 97, 102 (Mo. 1958). "It has further been held that oral evidence to establish a trust in opposition to the record title must be so clear and convincing 'as to exclude all doubt from the mind of the court'" *Id. quoting Swon v. Huddleston,* 282 S.W.2d 18, 25 (Mo. 1955).

> To establish an implied trust, whether a resulting or constructive trust, an extraordinary degree of proof is required and vague or shadowy evidence or a preponderance of the evidence is not sufficient. The evidence must be so unquestionable in its character, so clear, cogent and convincing that no reasonable doubt can be entertained as to its truth and the existence of the trust.

*Ellis,* 312 S.W.2d at 102 *quoting Aronson v. Spitcaufsky,* 260 S.W.2d 548, 549 (Mo. 1953) (further citations omitted). With this preface, we review the evidence in accord with Rule 73.01c, as interpreted in *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976).

In order to state a cause of action for a resulting trust, plaintiff *alleged* the following: (1) on or about October 23, 1992 plaintiff and defendants purchased real property described as "Lot 13 Lake St. Louis Plat 2;" (2) the purchase price was $87,000; (3) prior to closing he paid $1400 to Herman for closing costs, $375 for insurance costs and $30 for inspection fees "thereby obtaining his interest in said property"; and, (4) on October 23, 1992 plaintiff and Karen closed and took possession of the property in her name only "with the agreement that the real property was owned jointly by both Plaintiff and Defendant." He further alleged that the sole reason for placing the title in Karen's name was that the mortgage lender would not permit his name on the deed, "for security interest reasons." He alleged that for the period of November 1, 1992 through January 1995 he paid the monthly installment payments on Karen's note, which was secured by a deed of trust on the property. In fact, he alleged that he paid additional sums over and above the monthly installment payment. He alleged that: (1) on May 8, 1993 he paid Herman $500 to further his ownership; (2) on July 30, 1993 he paid Herman an additional $500 to further his ownership; (3) on October 8, 1994 he paid Herman $5000 to further his ownership; and, (4) in 1993 and 1994 he paid association fees of $925. Written memoranda, in the form of cancelled checks, for each payment to Herman were attached as exhibits. He also alleged that between October 23, 1992 and January 1995 he improved the property "totaling approximately $20,000.00." He alleged defendants sold the property for $128,000 in June 1996, which resulted in equity proceeds amounting to approximately $50,000; and, plaintiff's one-half equity interest was worth approximately $25,000, a sum held in escrow. He prayed for a judgment of a resulting trust and an order that $25,000 be released from escrow and paid to him for "his share of the equity proceeds from the sale."

Plaintiff offered all testimony and documentary evidence at trial. He called two friends who testified regarding improvements he added to the house and yard. He called Steven Hamann, a loan officer for North American Savings Bank, who advised him and Karen that plaintiff could not qualify for a loan because he had not been with his current employment long enough. Hamann testified that they did not discuss intentions as to who would own the house. He "assumed" they were buying it together. Hamann testified that when plaintiff introduced Karen he said, "we are trying to buy this home together."

Plaintiff's additional witnesses were Herman, Karen, and himself. In light of plaintiff's burden of proof, and our standard of review, we will briefly summarize the testimony of defendants. They denied any agreement or intent to purchase the house in the name of Karen on behalf of herself and plaintiff.

Herman, as plaintiff's witness, testified that both he and his wife gifted and loaned Karen $17,400 to be used as a down payment on the purchase of # 5 Savoy. They provided gift letters for the benefit of the lender on the note and purchase money deed of trust. He testified that the lender knew it was both a gift and a loan. The court found it was a loan. Herman testified that Karen bought the home on October 23, 1992 and that on November 1, 1992, approximately a week after the closing and on the birthday of a family member, plaintiff gave him a check for $1400 that had not been requested and said "that it was in appreciation for Alice, my wife, and I helping Karen purchase 5 Savoy." The check was dated October 21, 1992 and negotiated on November 4, 1992.

On October 8, 1994 Herman, Alice and plaintiff signed a document prepared by Herman and called it a "Partial Payment Receipt." Plaintiff relied on this document as written evidence of his agreement. It acknowledged receipt of $6000 from plaintiff as partial payment toward the initial down payment (principal) of $17,400 on the property at # 5 Savoy, Lake St. Louis, Missouri. The $1400 check and the $6000 reduced the "gift from Alice & Herman Correale to Karen Correale for the initial down payment on said property from 17,-400.00 dollars to $10,000.00 dollars. The intent of this payment is to obtain partial ownership in said property." At plaintiff's request, the following paragraph was added to the receipt: "[t]his payment will be refunded within 90 days upon request prior to official partial ownership of said property via quit claim deed action." No evidence was offered to support a finding that Karen had any knowledge of the transaction recited in the Partial Payment Receipt before October 8, 1994.

The $6000, referenced in the receipt, included $5000 given by plaintiff to Herman in October 1994 and two $500 checks given in May and July 1993. Herman interpreted the payments to be an effort to help pay off the loan to Karen, not for plaintiff to purchase an interest in the property. Herman expressly denied any agreement with plaintiff, at or prior to closing, about any monies plaintiff might pay. After plaintiff moved out in January 1995, he requested and received a full refund of all monies he had given to Herman and Alice; both the $1400 and the $6000 were repaid. Plaintiff accepted the repayments in accord with the second paragraph of the Partial Payment Receipt. Copies of plaintiff's cancelled checks, offered as exhibits, differed from copies of the checks that Herman received, because a notation of what the check was for, "# 5 Savoy," was added after it was endorsed and deposited.

Karen testified for plaintiff. She testified that her sale contract recited that plaintiff was acting as a real estate agent for the seller and had a relationship with her, as purchaser. He was engaged in the real estate business as a salesman. The $17,400 was received from her parents as a loan in exchange for a promissory note in like amount. She had no agreement with plaintiff to buy the house together. He

told her he would "not buy a house with any woman unless he was married. He told me that he was—had bad debts from his previous marriage and because he had tax liens against his property ..., he wouldn't be able to qualify." Plaintiff made a commission on Karen's purchase of the real estate. She had no knowledge that he had paid anyone anything at closing. Plaintiff did not testify otherwise. She had no agreement or understanding with the mortgage company that she would convey any specific interest to plaintiff. She learned from her father that on November 1, 1992, some weeks after the closing, plaintiff gave her father a check for $1400. She never saw it and did not say when she was informed by her father.

Karen and plaintiff lived in the property together after purchase. They agreed to share general expenses of running a household including, cost of food, utilities and mortgage payments. Plaintiff made numerous improvements and requested that Karen "pay him for the painters that he hired to paint the house." She did. She never agreed to pay him any specific amount from the proceeds of the sale of the house. She sold the house for $128,-000, but reported $110,600 on her tax return, the difference between the sale price and the $17,400 owed to her parents.[2] At the time of the sale, she and her father were titled owners of the property because of a quitclaim deed from her to herself and her father. Plaintiff prepared the quitclaim deed in December 1992. They recorded the deed on January 19, 1993 to secure the $17,400 interest of her parents.

■ The trial court found some testimony of Karen and Herman, plaintiff's witnesses, not credible. In the light of such findings, the stringent burden of proof to support a finding of a resulting trust, and our standard of review, we present plaintiff's testimony at length. He is bound by his own testimony on matters of fact, other than estimates, because such testimony "may be of such a character as to have all the force and effect of a judicial admission by which he is bound notwithstanding the testimony of other witnesses to the contrary." *Goggin v. Schoening*, 199 S.W.2d 87, 92 (Mo.App.1947).

Plaintiff testified that he was a sales agent for Gundaker Realty, operating seven years for them as an independent contractor. He first lived with Karen in 1989 in an apartment where she was the sole lessee; and, thereafter in another apartment where they were both lessees. They planned to be married. In December 1993, fourteen months after the property at # 5 Savoy was purchased, they were formally engaged. They had discussed marriage before the real estate closing. Plaintiff enjoyed very close, personal relations with Herman and Alice. He became interested in # 5 Savoy in August or September 1992. The home had been repossessed by Home Savings of America. Home Savings listed the property with Re/Max. As agent, he submitted a contract in Karen's name only. It was rejected. He thereafter obtained a Gundaker listing on the property. He represented the seller at closing. His newness on the job was the only reason he was not able to obtain a loan. His credit rating was good and he owned other real estate.

On direct examination, when asked about the existence of an agreement to purchase the house, plaintiff responded that "the agreement was we would buy the home just in Karen's name, and we would both be owners of the property." Karen paid $87,000 for the house and it subsequently sold for $128,000. In order for her to qualify for the loan, she needed twenty percent down. Her father offered a gift of $17,400, "and between her dad, his gift and some pre-payments that between us we made, we got the house." When asked what amount of cash plaintiff "put

2. Herman and Alice reported a sale on tax returns of their $17,400 interest in the property. Karen reported a sale on tax returns of her $110,600 interest. Herman, Alice and Karen were the Grantors.

into the closing" for #5 Savoy, he answered $1850 [sic], which consisted of a check to Herman for $1400, approximately $375 for insurance and $30 for inspection. After closing, Herman began discussing his interest in the property and requested security for his fifty-percent interest. Thereafter, Herman and Alice agreed to "go on" a quitclaim deed as fifty-percent owners. Plaintiff helped prepare the quitclaim deed. The agreement was that once they repaid Herman's gift, which was now a loan, "then the property would be ours and he would come off of the Quit–Claim Deed."

Plaintiff also testified to an agreement with Karen that "if I would pay back half of the seventeen thousand four hundred [dollars] to Herman, he and Alice would come off the Quit–Claim Deed and I would come on as fifty percent owner." He was unsure when they discussed or made the agreement, but said that it had been reduced to writing at that time. However, there was no 1992 or 1993 written agreement offered into evidence. Plaintiff later identified the Partial Payment Receipt of October 8, 1994, prepared by Herman, as the only writing signed by some of the parties. Karen never signed it. Although the receipt referred to two checks for $500 written in 1993 and a $5000 check on the meeting date of October 8, 1994, plaintiff testified differently. He claimed the receipt represented a written clarification of the transaction and confirmed:

> [T]hat once I paid half of the seventeen thousand four hundred [dollars], him and Alice would come off the Quit–Claim Deed. I would go on it as fifty percent owner, and Karen's seventeen thousand four hundred—half of her seventeen thousand four hundred would come from her inheritance, unless of course she paid, which also was an option.

Plaintiff requested the receipt. He never testified that Karen was involved with the preparation or execution of the receipt, or that she had knowledge of it. At that time, he was still engaged to Karen.

Plaintiff offered evidence to support findings that he made numerous home improvements, the amount of his expenditures and his work time. However, he did not specifically keep a record of the hours worked. He claimed compensation of $20 per hour, except for the landscaping work, which he estimated to be worth $30 per hour. His repairs were voluntary and Karen never agreed to pay him for his labor. No contract for repairs existed and plaintiff never intended to send Karen a bill.

He described his money and investments in the property as: (1) $1805 for closing costs; (2) $15,000 for mortgage payments made in 1992 through January 1995; (3) $1200 for associate fees; (4) $6000 in payment to Herman "to repay my half of the loan that he made us"; (5) $8700 for improvements; and, (6) $10,800 for labor costs. He requested the court to approve a statement of labor costs, as reasonable charges by him. In addition to repayments made by Herman to plaintiff, Herman told him "he would see that I got the rest of my money, my investment money back at closing" when he and Karen sold the house. Herman repaid the $1400 and the $6000 originally given by plaintiff. When he discussed his position with Karen, she always maintained she would pay him.

On cross-examination, plaintiff testified that when he made his last mortgage payment in January 1995 there was a balance of $67,509 owed on the original $69,600 loan, just over $2000 had been paid on the principal. He "assumed" that when Karen sold the house she would split the proceeds. When asked if she said that, he answered "no." When asked what investment he wanted to recoup he answered "the forty-six thousand dollars that I put into the house," which included the interest that he paid in the mortgage payments. When asked if he agreed to make any specific number of mortgage payments he answered, "I agreed to pay the payments

while I was there. I didn't agree to pay for it when I moved out."

In summary, plaintiff testified he was "an owner in the sense that we had an agreement. It was our house." His contribution at closing was $1805, which consisted of three payments. The entire content of the agreement with Karen was that "it was purchased and was going to be our house." Specifically, when asked what the agreement as to what interest plaintiff was going to acquire in the property he answered:

> It wasn't real cut and dried at closing. What was agreed upon was, *if* I paid half of Herman's initial down payment back to him, I would become a fifty percent owner of the property. That is why I helped draft the Quit–Claim Deed and put him on there as a fifty percent owner, and I agree that it is only fair that *if* I bought his half interest out, I would be half owner officially and in writing.

(Emphasis added). The only written document involving his agreement was the 1994 Partial Payment Receipt. Plaintiff described it as a "family agreement" in an effort to explain why it does not contain any provision obligating him to pay any fixed amount of money to Herman. Thereafter, plaintiff repeated that the agreement was, "*if* I repaid half of the seventeen four – eight thousand seven hundred, he [Herman] would come off of the Quit–Claim Deed and I would come on." He then acknowledged never paying Herman $8700, which would be one-half of the loan to Karen.

The Partial Payment Receipt contained a provision that plaintiff could demand that Herman and Alice repay whatever he paid them under the agreement. Plaintiff insisted on that provision, testifying that in case something happened he "wanted to recapture my investment." He asked Herman for a refund. He demanded repayment of the original payment of $1400 and what was paid under the Partial Payment Receipt, and he was repaid. He

acknowledged he made no payments to the lender bank at or before Karen's closing. He agreed with Karen to make mortgage payments until he moved out. He did not identify when this occurred. He did not agree to make any specific number of house payments on Karen's note, which was secured by a deed of trust.

In 1993 plaintiff made the mortgage payments on Karen's loan, first to her and, starting in July, he made the payments directly to the lender to assure the money was going where it was supposed to. He made one payment in 1995 before moving out in mid-January. He made the decision to leave. Karen was to inform him of the sale of the property, "because I had a whole lot of interest in the property." However, he felt that Karen did nothing improper or fraudulent to him or to induce the mortgage lender to give her the loan. He did not consider Herman's actions improper and did not believe that a fraud was committed against him, which resulted in the quitclaim deed from Karen to Herman and herself.

In Count IV of his petition, breach of contract, plaintiff alleged that on October 23, 1992 he entered into a contract with defendants in which "they agreed to purchase said real property." He further alleged that Herman and Alice were to advance $17,400 as a down payment, which plaintiff and Karen would repay by each contributing one-half. He alleged that on October 8, 1994 the contractual agreement was affirmed in writing in the form of the Partial Payment Receipt. He alleged that on March 12, 1996 he and Herman reaffirmed the contractual agreement via telephone conversation when Herman assured plaintiff that he would receive his equitable interest at the closing of the sale of the property.

During cross-examination, when asked if the pleading referred to the Partial Payment Receipt plaintiff answered that "the resulting trust—that was my contract. It was an oral contract." He testified that

Herman "wasn't loaning it [$17,400] specifically to me, but ultimately he was loaning it to us. That is why I was paying him back." Plaintiff testified that he had no reason to believe Herman did not loan the money to both him and Karen, as Herman offered to loan plaintiff money in the past and plaintiff refused. Plaintiff made no specific agreement to repay the loan at the time of the closing, but described the general agreement as they would pay what they could. He testified that they "lived as a family. We weren't roommates with a schedule. You paid what you could. When we lived in the rental house I paid all the rental payments. When we moved into the house, I paid—put the house payments—she paid what she could." When he moved out of the property plaintiff saw "no further reason to make the payments." In fact, he made no further mortgage payments because he was never obligated to make any mortgage payments to the mortgage lender.

Plaintiff's evidence wholly fails to meet his burden of proof of clear, cogent and convincing evidence so "as to exclude all doubt from the mind of the court." *Ellis,* 312 S.W.2d at 102. First, in order to meet the requirements of proof to support a finding of resulting trust, plaintiff must have offered evidence from which the court could find he made some contribution to the purchase price. The evidence may include an agreement to make payments on the purchase money note and deed of trust given as part of purchase price, if the agreement is made before closing. There must be evidence to support a finding that an agreement existed at the time of closing that he was to acquire, at closing, a defined and specific interest in the real estate because of his existing agreement to pay part of the consideration for the purchase. *Dallas,* 670 S.W.2d at 538. Plaintiff's evidence also failed to satisfy his burden of proof because his actions and conduct were inconsistent with his theory of resulting trust.

Second, the evidence will not support a finding that he furnished any of the consideration for the conveyance to Karen. He testified that he spent $30 for inspection fees and $375 for insurance costs. These sums and a subsequent check payable to Herman for $1400 were "put into the closing." These payments will not support a finding that plaintiff paid any part of the purchase price, even if they constitute expenses required before closing. Plaintiff did not testify that Karen, who became the record title holder, had any knowledge of the $1400 check. She had no knowledge of its preparation or purpose before it was given to Herman. Karen agreed to pay $87,000 for the property. She used her own money, a loan from her parents, and a note and deed of trust to pay the purchase price. She was the only person obligated on the note. The requisite evidence of plaintiff's partial payment of the purchase price is vague or wholly missing. *See Id.*

In *Dallas,* we recognized an exception to the requirement that one who claims an interest in real estate on the theory of a resulting trust must pay part of the purchase price at or before closing. *Id.* at 539. Evidence of an existing agreement that plaintiff would be obligated at the time of closing to make payments on the purchase money note and deed of trust would suffice. *Id.* (further citations omitted). Here, plaintiff testified that he was not obligated on the note or deed of trust. He elected to make payments in 1992, 1993, 1994 and one payment in 1995 while living with Karen in the house. However, he testified that he did not agree to pay for the house when he moved out. This position is inconsistent with his theory that he and Karen, by their actions and conduct, intended to place the real estate in her name, but maintain joint liability for the purchase price. He specifically denied having any intention of making any specific number of house payments on "Karen's note."

Third, plaintiff's evidence wholly fails to support a finding that the parties intended for him to acquire any defined or specific interest when the property was purchased in Karen's name only. Generally, he testified that it was to be "our" house and that he was to be an owner in the sense that it was "our house." When specifically asked what interest he would acquire, he answered that "[i]t wasn't real cut and dried at closing." He offered evidence to support a finding that sometime *after* closing there was an agreement that *if* he paid Herman's initial down payment of $17,400, *then* he would become a fifty-percent owner of the property. This evidence is of no benefit to plaintiff for at least two reasons. First, it is conditional, and the conditions were never satisfied. Second, several months after Karen purchased the property plaintiff assisted in the preparation of a quitclaim deed, which Karen used to deed a fifty-percent interest each to herself and her father. Any agreement relative to acquiring Herman's interest in the property must have occurred after the quitclaim deed as he had no record interest in the property until the deed was signed. If plaintiff is entitled to a resulting trust, his evidence must support a finding that he acquired an interest at the instant Karen acquired the property in October 1992. *Id.; Ellis*, 312 S.W.2d at 103. The right to the interest is not founded in contract. Specifying a fifty-percent interest by an agreement made *subsequent* to purchase is insufficient to define a specific interest as contemplated by the actions and conduct of the parties *before* the purchase. Thus, the evidence of a subsequent agreement is irrelevant to a claim of an interest on the theory of resulting trust.

Fourth, plaintiff wholly failed to produce clear, cogent and convincing evidence to support a finding that Karen had knowledge of, or agreed with, any of his arrangements with her father. Absolutely no evidence exists to support the required finding of *what* interest the parties intended plaintiff to acquire at the time of purchase.

Fifth, plaintiff's evidence was generally vague and indefinite on the existence of any agreement with Karen, which directed their conduct when she purchased the property. Herman and Karen both testified there was no agreement and no intent that plaintiff have an ownership interest in the property, or that he was obligated at the time of purchase to pay the consideration. However, we may ignore the testimony of Herman and Karen and, instead, consider only plaintiff's testimony and all reasonable inferences consistent with his testimony as a basis for reviewing the sufficiency of the evidence. *See Costello v. Shelter Mut. Ins. Co.*, 697 S.W.2d 236, 237 (Mo.App.1985). Part of the confusion lies in the fact that plaintiff testified to "an agreement" as if he was relying on only one agreement. However, his testimony suggests there were two or more different "agreements" with · different parties. Hence, his testimony in this respect creates an ambiguity or vagueness on the question of the parties' intentions before Karen purchased the property in October 1992. For example, plaintiff testified that the Partial Payment Receipt prepared and signed in 1994, clarified in writing what "they" were actually doing and confirmed that *if* he paid $17,400 to Herman and Alice *then* he would be a fifty-percent owner. The receipt also provided that plaintiff had an option to request repayment of any funds he paid to Herman and Alice with respect to the $17,400 they loaned to Karen. Obviously, that evidence will not support a finding that Karen purchased the property in 1992 for herself and plaintiff in accordance with a 1994 agreement that plaintiff entered with Herman and Alice. Moreover, his testimony will not support a finding that Karen was aware he was giving money to her parents and entering into a conditional agreement to purchase from them Herman's interest in the property.

Finally, plaintiff's testimony is vague and ambiguous regarding any intention

that he acquire some interest in the real estate because of actions and conduct, which were inconsistent with his theory of resulting trust. First, he acted as a real estate salesman for the grantor when Karen purchased the property. He was paid a commission for his services. He did not waive the fee. He did not testify the fee was part of an agreement guiding his conduct before and at the time of purchase. Under ordinary circumstances a grantee does not charge himself and pay a real estate commission. It makes no sense that a purchaser would create additional taxable income when he claims to be a purchaser. Second, in the Partial Payment Receipt he agreed that his acquisition of *their* fifty-percent interest in the property was conditioned upon payment to Herman and Alice of a fixed sum; and, the receipt contained a provision that his payments to them were refundable at his request. His position as a party to a conditional purchase agreement is inconsistent with any claim to be an owner of an interest on the theory of resulting trust. The theory that plaintiff owned a one-half interest at the time Karen purchased the property is inconsistent with his position of conditional purchase of a one-half interest from Herman and Alice, his wife, who obtained an interest from Karen. Finally, plaintiff claims that he was entitled to be compensated for his expenses and labor in maintaining and/or improving the property. This is wholly inconsistent with his theory that he was an owner of an interest on the theory of resulting trust. As a matter of law, these claims would be viewed differently if the unspecified and unidentified interest, which he was claiming was: (1) as a joint tenant; or, (2) as a tenant in common; or, (3) as a purchaser under a conditional contract.

We do not reach the defendants' argument regarding the miscalculation of damages. Nor do we reach the implied judgments for defendants on plaintiff's alternative causes of action because they were not appealed.

Defendants have requested this court for relief in addition to reversing the judgment on Count II. An escrow company holding $25,575.21 of sale proceeds paid that sum to plaintiff on the faith of the judgment we now reverse. Defendants requested an order that plaintiff return that sum to Karen, together with accrued interest. Karen also requested an order to enforce the repayment. We decline to rule on the requests. On proper motion, these matters may be considered by the trial court when this opinion becomes final.

The judgment on Count II, resulting trust, is reversed. The judgment on Count VII, conversion, is affirmed.

WILLIAM H. CRANDALL, Jr., P.J. and MARY K. HOFF, J. concur.