

## Missouri Court of Appeals
### Southern District
### Division One

DAVID LYNN SCOTT and DONNA SCOTT,     )
                                        )

     Plaintiffs-Appellants,            )
                                          )

vs.                                      )     Nos. SD35181 and SD35184
                                          )

RICHARD HICKS and JAN HICKS,        )     Filed January 8, 2019
                                          )

     Defendants-Respondents.       )

### APPEAL FROM THE CIRCUIT COURT OF DALLAS COUNTY

Honorable Calvin R. Holden

AFFIRMED

David Lynn ("Lynn") Scott and Donna Scott, husband and wife (collectively "Appellants"), appeal the trial court's judgment granting a motion for judgment notwithstanding the verdict ("JNOV") filed by Richard Hicks and Jan Hicks, husband and wife (collectively "Respondents").[1] That judgment declared that Appellants' adverse possession claim to approximately 314 acres of land (the "disputed property") was not supported by substantial evidence and awarded Respondents immediate possession of the property. In one point relied on, Appellants claim that the trial court erred in "granting [Respondents'] motion for [JNOV] and entering judgment in favor of [Respondents], because the evidence supporting each element

---

[1] Because of shared last names, surnames are used as needed for clarity and ease of reference. No familiarity or disrespect is intended.

of the adverse possession claim, specifically those claimed insufficient by the trial court; hostile, open and notorious, and exclusive, was sufficient to support the verdict, when taken in the light most favorable to the verdict." Finding that Appellants did not make a submissible case in that they failed to adduce substantial evidence supporting the "hostile" element of their adverse possession claim, we affirm.

## Applicable Principles of Review and Governing Law

Our review is limited to a determination of whether Appellants made a submissible case. *Keveney v. Mo. Military Academy*, 304 S.W.3d 98, 104 (Mo. banc 2010). "In order to make a submissible case, each element of a plaintiff's claim must be supported by substantial evidence." *Delacroix v. Doncasters, Inc.*, 407 S.W.3d 13, 26 (Mo. banc 2013). In determining whether a case was submissible, this court considers the evidence and all reasonable inferences drawn therefrom in the light most favorable to the plaintiff and disregards all contrary evidence and inferences. *Id.* However, we will not supply missing evidence or give the plaintiff the benefit of unreasonable, speculative, or forced inferences. *Steward v. Baywood Villages Condominium Ass'n*, 134 S.W.3d 679, 682 (Mo.App. 2004). Moreover,

> "'[w]hen we say that a plaintiff is entitled to a favorable view of the whole evidence, we do not mean that material facts testified to by plaintiff may be ignored.'" *Williams v. Kansas City Transit, Inc.*, 339 S.W.2d 792, 797–98 (Mo. 1960) (quoting *Brooks v. Stewart*, 335 S.W.2d 104, 110 (Mo. 1960)). A party is bound by his or her own testimony on matters of fact (other than estimates of time, distance, or location) unless corrected or explained. *Id.* at 798; *Brandt v. Pelican*, 856 S.W.2d 658, 664 (Mo. banc 1993); *Zabol v. Lasky*, 555 S.W.2d 299, 304 (Mo. banc 1977); *Wuerz v. Huffaker*, 42 S.W.3d 652, 655, 657–58 (Mo.App. 2001). This is because a party's testimony "'may be of such a character as to have all the force and effect of a judicial admission by which he is bound notwithstanding the testimony of other witnesses to the contrary.'" *Correale v. Hall*, 9 S.W.3d 624, 629 (Mo.App. 1999) (quoting *Goggin v. Schoening*, 199 S.W.2d 87, 92 (Mo.App. 1947)).

*Id.* "It is well-settled that a party is bound by his own testimony [that] is not corrected or explained." *Ewanchuk v. Mitchell*, 154 S.W.3d 476, 481 (Mo.App. 2005). A plaintiff's

2

uncorrected or unexplained testimony admitting material facts has been characterized as a type of uncontested evidence. *See White v. Dir. of Revenue*, 321 S.W.3d 298, 308 (Mo. banc 2010) (evidence is uncontested when a party has admitted through the party's individual testimony the basic facts of other party's case). "In such cases, the issue is legal, and there is no finding of fact to which to defer." *Id.* In other words, such facts must be accepted as conclusively proven. *All Am. Painting, LLC v. Fin. Sols. & Assocs., Inc.*, 315 S.W.3d 719, 723 (Mo. banc 2010).

In order to prevail on their adverse possession claim, Appellants had to prove their possession of the disputed property was: (1) hostile and under a claim of right; (2) actual; (3) open and notorious; (4) exclusive; and (5) continuous for a period of ten years. *Watson v. Mense*, 298 S.W.3d 521, 526 (Mo. banc 2009). The failure to establish any one of the elements will necessarily defeat the claim. *White v. Matthews*, 506 S.W.3d 382, 388 (Mo.App. 2016). "Adverse possession presents mixed questions of law and facts, and the principles or elements to prove such a case are considered with the view that every property may be unique and each case must be decided in light of its own unique circumstances." *Weaver v. Helm*, 941 S.W.2d 801, 804–05 (Mo.App. 1997).

### Factual and Procedural History

Viewed in accordance with the above principles, the facts relevant to this appeal are as follows.[2] Lynn was born in 1952 and thereafter lived with his parents, David and Margaret Scott, on their family farm in Niangua, Webster County, Missouri. Lynn resided in his parents' home on the farm for twenty-three years. When Lynn was born, his parents owned 80 acres of farmland, and David ran a dairy farm on the land. Later, Margaret inherited a nearby 110 acres

---

[2] While Lynn testified at trial, Donna did not. Moreover, Donna made no attempt during trial to correct or explain any part of Lynn's testimony. Rather, as made clear in Appellants' closing arguments, Donna implicitly adopted and explicitly relied upon Lynn's testimony to establish the basis for their joint claim, as husband and wife, of adverse possession to the disputed property.

from her parents, and David used this land to grow hay and pasture livestock. When Lynn was around ten years old, he began helping David on the farm.

When Lynn turned fourteen years old, he began clearing pastures and milking cows located on the 110 acres belonging to Margaret's parents that Margaret later inherited in 1980. Then in 1968, David bought an additional 68 acres of land from Margaret's aunt and uncle, which was located next to the original 80 acres. After this purchase, David and Margaret had a total of around 260 acres of land. In 1970, Lynn graduated high school but stayed home to work on the farm. In 1971, David bought 210 acres of land, which laid on the two sides of the 110 acres. Following this purchase, the Scott farm totaled 470 acres, and there have been no additions since then.[3] However, the Scotts have sold some acres here and there.

In the early 1970s, David stopped working on the farm as much as he previously did as he held another job. During this time, Lynn took over most of the farm duties, including haying, tending crops and livestock, milking, and transacting farm business. Throughout this time, Lynn considered himself in a partnership with David as they shared expenses and income. Appellants married in 1975, and Lynn took over all of the day-to-day activities of running the farm due to David's age and closeness to retirement. Following their marriage, Appellants moved into an old house on the farm.

Sometime around 1981, David retired. In 1981, Lynn signed a quitclaim deed conveying 216.5 acres of the disputed property to David and Margaret. David and Margaret had previously deeded this same land to Lynn, but they decided to place the land in a trust and "deed it back" later since David and Margaret were concerned about what would happen if Appellants' marriage did not last. During 1981, Appellants became solely responsible for all of the disputed

---

[3] The disputed property contains the 110 acres that Margaret inherited from her parents, and the 210 acres that David bought in 1971, minus five parcels of land that were conveyed between 1993-1995, for a total of around 314 acres.

4

property's income and expenses, and as such, reported all items on their tax returns and have continued to do so since then. While David would rake hay for Lynn approximately once a year until he died in 1983, Margaret did not help on the disputed property because she was physically unable to do so. Since 1981, Margaret has not had any involvement with the disputed property. According to Lynn, Margaret simply "liked to get out and look at crops and look at things" and, as such, he "took her anywhere she wanted to go." None of Appellants' farming activities ever went against Margaret's wishes, and Margaret never asked Appellants to stop doing any particular activity on the disputed property.

Between 1993 and 1995, Lynn wanted to raise capital in order to build himself and his family a new house near the disputed property, so he decided to sell five parcels of land. In order to sell these parcels, however, Lynn needed for Margaret to sign each of the five deeds, which she did for each sale.

In 1999, Margaret signed a beneficiary deed conveying the disputed property to Lynn upon Margaret's death.[4] Lynn believed the reason for this beneficiary deed was so he would not have to pay taxes upon Margaret's death. Also in 1999, Margaret deeded Appellants title to approximately 10 acres of land across the road from the disputed property for Appellants to build a house.

In 2007, due to a farming hardship, Appellants attempted to obtain a loan at the Seymour Bank secured by the disputed property (the "2007 loan"). Lynn informed Margaret that he "needed" her to sign the deed of trust (the "2007 Deed of Trust") because the title was in her name. Margaret complied and signed the deed of trust. Lynn made all of the payments on this loan until 2013.

_____

[4] The beneficiary deed also included other real estate not at issue in this case.

In 2009, Lynn, Margaret, and Lynn's son, Jared Scott, filed a lawsuit against Richard, one of the Respondents, claiming that Richard's cattle had trespassed on the disputed property. Their petition alleged that Margaret was the title owner of the disputed property and Lynn and Jared worked on the disputed property. As part of this lawsuit, Margaret, Lynn, and Jared signed sworn answers to interrogatories, which included stating, "Jared L. Scott and [Lynn] Scott use Plaintiff Margaret's [sic] Scott's land. Margaret is family, additionally, she allows us to use the property and has deeded it to us in a beneficiary deed in the event of her death." Margaret further swore that Lynn and Jared "operate my family farm." Furthermore, in a deposition for this lawsuit, Lynn admitted that while Margaret "owned title" to the disputed property, he "own[ed] possession."

In 2013, after trying to make a payment on the 2007 loan, Appellants learned that the disputed property had been sold. It was discovered that on February 8, 2013, Respondents received as grantees a General Warranty Deed from Margaret executed on her behalf by Jan Nunn, Margaret's attorney in fact under a power of attorney, and Lynn's sister. The deed described the disputed property in the same manner as that described in the 1999 beneficiary deed and in the 2007 Deed of Trust. Respondents paid Margaret $385,000 for the disputed property.

Following this discovery, Appellants and Jared and Mary Scott, husband and wife, filed this action. Their second amended petition asserted a claim that they had acquired title to the disputed property through adverse possession and a claim for undue influence. Appellants proceeded to trial on their second amended petition, wherein the trial court dismissed Jared and Mary's claims with prejudice and dismissed Appellants' alternative claim of undue influence. At the close of Appellants' evidence, Respondents moved for a directed verdict, which the trial

6

court denied. Respondents renewed their motion for directed verdict at the close of all evidence, which the trial court also denied. After closing arguments and deliberation, the jury returned a verdict for Appellants, finding they had adversely possessed the disputed property.

Following the adverse jury verdict, Respondents timely moved for a JNOV, and the trial court granted the motion in its judgment, finding that Appellants did not make a submissible case for adverse possession of the disputed property by failing to present substantial evidence supporting that their possession of the disputed property was hostile, open and notorious, or exclusive. Appellants timely appeal that judgment.

### Discussion

In their sole point on appeal, Appellants first argue the trial court erred in finding they failed to present substantial evidence supporting that their possession of the disputed property was hostile. We disagree.

"Adverse possession for the statutory period establishes an indefeasible legal title in the possessor, the title of the record owner is divested, and that title is not lost by abandonment, or failure to assert it after it has been perfected." *City of South Greenfield*, 591 S.W.2d at 161 (citing *La Grange Reorganized Sch. Dist. No. R–VI v. Smith*, 312 S.W.2d 135, 139 (Mo.1958)).

> Adverse… means that the one making the use shall not recognize in those as against whom it is claimed to be adverse an authority either to prevent or to permit its continuance. It is the non-recognition of such authority at the time a use is made which determines whether it is adverse.

*Benson v. Fekete*, 424 S.W.2d 729, 738 (Mo. banc 1968) (internal quotation marks omitted). This "adverse" quality, as opposed to mere possession, is taken into account within the hostile element of an adverse possession claim.

"Missouri cases have consistently held that to satisfy the 'hostile,' i.e. under a 'claim of right' element only requires that the adverse possessor show the intent to occupy the disputed

7

property as his own, exclusive of the rights of *all* others." ***DeVore v. Vaughn***, 504 S.W.3d 176, 181 (Mo.App. 2016) (emphasis added). The "hostility" element means that "the possession must be opposed and antagonistic to the claims of *all* others, and the claimant must occupy the land with an intent to possess it as his or her own." ***Flowers v. Roberts***, 979 S.W.2d 465, 469 (Mo.App. 1998) (emphasis added). To be hostile, it is not necessary to have actual malice, hostility, indifference, or intent to take the property that belongs to another. ***DeVore***, 504 S.W.3d at 181. The intent to possess, occupy, control, use, and exercise dominion over the property is sufficient. ***Id.*** at 182.

"Whether one's possession of land is 'hostile' is a question of the claimant's intent." ***White***, 506 S.W.3d at 390. The claimant must occupy the land with the intent to possess it as his own; his occupancy must be in defiance of, not in subordination to, the rights of others. ***Rohner v. Beets***, 396 S.W.3d 458, 461 (Mo.App. 2013). "Permissive use will not support a claim of adverse possession because hostile possession is lacking." ***Brokhausen v. Waubansee***, 65 S.W.3d 598, 600 (Mo.App. 2002). "An adverse possessor does not recognize the authority of the record titleholder to permit or to prevent his continued use of the property claimed." ***Weaver v. Helm***, 941 S.W.2d 801, 805 (Mo.App. 1997). "Furthermore, the claim of right or ownership must be unequivocal." ***Id.***

In their brief, Appellants argue that substantial evidence supports that they began adversely possessing the disputed property beginning in 1981.[5] Lynn testified that approximately in 1981, his partnership with his father, David, ended. Lynn also testified that in 1981, Appellants deeded approximately 216.5 acres of the disputed property to David and Margaret via a quitclaim deed. Lynn testified that David and Margaret had previously deeded

---

[5] Appellants conceded at trial that they could not establish adverse possession before 1981 but that their adverse possession claim arose thereafter.

8

the 216.5 acres to him, but the three of them decided to deed it back to David and Margaret so that David and Margaret could put the 216.5 acres into a trust and eventually deed it back to Lynn. The reason for this transfer of title was that David and Margaret were concerned about what would happen if Appellants' marriage did not last and Lynn agreed with them. By deeding the 216.5 acres of the disputed property to David and Margaret, Appellants acknowledged that they were not adversely possessing the disputed property in 1981 because they knowingly and intentionally transferred legal title to David and Margaret.

By signing the quitclaim deed, Appellants conveyed whatever rights, titles, and interests they may have possessed to David and Margaret.[6] *See **Humphrey v. Sisk***, 890 S.W.2d 18, 21 (Mo.App. 1994) ("a quitclaim deed is as effective as any other deed for the purpose of transferring title"). Thus, Appellants knowingly and intentionally recognized, through their grant of legal title by deed, the superior rights of David and Margaret, and as such, Appellants were not hostilely possessing the 216.5 acres of the disputed property at that time. *See **Teson v. Vasquez***, 561 S.W.2d 119, 127 (Mo.App. 1977).

> The general rule is that, in order to make continuity of possession after the delivery of the deed the basis of an adverse holding, the grantor must, by words, acts, or conduct, apprise the grantee that he is claiming title and possession of the land against the covenants of his deed; for, until such notice is expressly or impliedly given to the grantee, he will be entitled to rest secure upon the legal presumption that the continued possession of the land by the grantor is in subservience to the grant.

***Reinheimer v. Rhedans***, 327 S.W.2d 823, 830 (Mo. 1959).

---

[6] Following the legal description in that quit claim deed, the habendum clause provided:
> TO HAVE AND TO HOLD THE SAME, with all the rights, immunities, privileges and appurtenances thereto belonging, unto [David and Margaret] and unto their heirs and assigns forever; so that neither [Lynn and Donna] nor their heirs nor any other person or persons, for them or in their name or behalf, shall or will hereinafter claim or demand any right or title to the aforesaid premises or any part thereof, but they and each of them shall, by these presents, be excluded and forever barred.

9

As for the remaining part of the disputed property, the 110 acres inherited by Margaret from her parents that is surrounded on two sides by the deeded 216.5 acre tract, Lynn testified that he and David were in a "partnership[,]" which supports that he and David initially had permission to possess and use *all* of the disputed property. Even though Lynn stated that his partnership with David ended in approximately 1981, Lynn's use of the disputed property remained permissive until Lynn distinctively and positively asserted a right hostile to David or Margaret's title, which Lynn never did. *See **Homan v. Hutchinson***, 817 S.W.2d 944, 948 (Mo.App. 1991); ***Williams v. Diederich***, 223 S.W.2d 402, 404 (1949) ("[i]f possession was permissive at its inception, then it remained so until the hostile claim was brought home to the true owner"). Appellants' possession of the disputed property in 1981, therefore, was not hostile because a "grant of permission is inconsistent with the hostility element of adverse possession." ***Daniels-Kerr v. Crosby***, 484 S.W.3d 798, 802 (Mo.App. 2016).

Appellants adduced substantial evidence that they possessed and farmed the disputed property from 1981 until trial. They fail, however, to point us to any evidence in the record, and our review finds none, supporting that between 1981 and 1993 they spoke any words, took any actions, or engaged in any conduct to apprise either David or Margaret that the character of their continued possession of the disputed property had deviated in any respect from their initial permissive possession consistent with David and Margaret's legal title acquired either by Appellants' quit claim deed to them or Margaret's inheritance from her parents. *See **Reinheimer***, 327 S.W.2d at 830. Moreover, Appellants' admitted and uncontested evidence of their actions in 1993 and thereafter conclusively prove that their possession of the disputed property during the 1981-1993 period was not hostile as to David or Margaret's legal title.

Between 1993 and 1995, Lynn wanted to build a new house for his family. In order to raise funds for construction, Lynn needed to sell five parcels of the then-somewhat larger disputed property. However, in order to sell these five parcels, Lynn testified that he "needed" Margaret's signature consenting to the sale. Thereafter, Margaret consented and repeatedly proceeded to sign, over that two-year period, all five deeds making those conveyances. Lynn conceded that Appellants would not have been able to sell the five parcels had Margaret not signed the deeds.

As of the first sell-off in 1993, Appellants' possession of the disputed property could not have been hostile to Margaret's legal title for the requisite ten-year period because Appellants acknowledged at that time they could not do what they wanted to do with the land; i.e., sell a part of the disputed property without Margaret's consent. *See Weaver*, 941 S.W.2d at 805 ("[a]n adverse possessor does not recognize the authority of the record titleholder to permit or to prevent his continued use of the property claimed."). Furthermore, by voluntarily, knowingly, and intentionally seeking Margaret's permission, in the form of her signature as grantor on the deeds, Appellants recognized and deferred to her legal title to the disputed property at that time. This action establishes that their claim by possession at that time was in subordination of, not in defiance of, Margaret's title. *See Weaver*, 941 S.W.2d at 805. While Appellants' evidence at trial focused almost exclusively upon their lengthy possession of the disputed property, it has been previously observed by our supreme court, however, that "[p]ossession of land in recognition of a lack of title is insufficient ever to ripen into title by adverse possession." *Reinheimer*, 327 S.W.2d at 831 (quoting *Riebold v. Smith*, 150 S.W.2d 599, 602 (Mo.App. 1941)). Appellants' possession of the disputed property, therefore, had not become hostile as to

11

Margaret's legal title as of 1993 or at any time thereafter through 1995, when Margaret conveyed the fifth sell-off.

In 1999, Margaret signed a beneficiary deed conveying the disputed property to Lynn upon her death. Lynn testified that a beneficiary deed was "a way of conveying ownership from one person to another upon death." Lynn further testified that he did not file an adverse possession lawsuit against Margaret because he "[saw] no purpose in that" since he "already owned [the disputed property]" and that "[the disputed property] was in a beneficiary deed to me." Lynn believed that he "earned" the disputed property and that it would pass to him upon Margaret's death. Lynn stated that he was fine with this arrangement as he did not want to take title to the disputed property because he wanted to avoid paying capital gains taxes. Appellants' knowing and intentional acquiescence in and support of Margaret's actions at that time and her title right to direct the disposition of the disputed property upon her death, in order to secure for themselves a financial tax benefit, is Appellants' recognition of Margaret's legal title to the disputed property at that time and the subservience of their possessory rights to her legal title. *See Reinheimer*, 327 S.W.2d at 831; *Weaver*, 941 S.W.2d at 805. Therefore, Appellants' possession of the disputed property had not become hostile to Margaret's legal title as of 1999.

In 2007, Appellants attempted to obtain a loan from Seymour Bank. Appellants needed a loan in order to pay off another loan that was past due. In applying for this loan, the application asked Appellants to list their assets under a column titled "ASSETS[.]" Under the "Real Estate Owned" section of the "ASSETS" column, Appellants listed they owned a market value of $170,000 in real estate. Lynn testified that this $170,000 valuation was based solely on Appellants' home and the ten acres upon which it was located. For Appellants to receive the desired loan, however, Lynn testified that he "needed" Margaret to pledge the disputed property

12

that was titled in her name as collateral. Because of this, Margaret submitted a loan application, which also included a column titled "ASSETS[.]" Under the "Real Estate Owned" section of the "ASSETS" column, Margaret listed she owned a market value of $750,000 in real estate, specifically a "farm and home[.]" Lynn acknowledged that Margaret's loan application, specifically the real estate owned, was accurate since the disputed property was "titled to her" and that he had no objection to the disputed property being titled to her. Additionally, Lynn testified that Appellants would not have been able to receive a loan had Margaret not pledged her property as collateral.

Appellants' exclusion of the disputed property in their loan application was a voluntary, knowing, and intentional recognition that their possession of the disputed property was subservient to a "recognized, superior claim of another," i.e., Margaret's record legal title. *Porter v. Posey*, 592 S.W.2d 844, 850 (Mo.App. 1979). Likewise, Appellants' admitted necessity for Margaret to pledge the disputed property as collateral for their loan was a knowing and intentional acknowledgment that Margaret had not been divested of title to the disputed property as of that date and therefore, that Appellants' possession of the disputed property had not been hostile during any ten-year period on or before that date. *See Nutting v. Reis*, 326 S.W.3d 127, 130 (Mo.App. 2010) ("[t]he adverse possessor is vested with title and the record owner is divested once the ten-year period has run").

In 2009, Margaret, Lynn, and Jared filed a petition against Richard alleging that Richard's cattle had trespassed on the disputed property. In this petition, Margaret, Lynn, and Jared all specifically alleged that "Margaret [] is the title owner of property in Webster County, Missouri which is the subject of this lawsuit." Additionally, Margaret, Lynn, and Jared all stated that Lynn and Jared "works [sic] and farms [sic] the subject land described above."

13

Furthermore, Margaret, Lynn, and Jared signed sworn answers to interrogatories, in which all three stated: "Jared [] and [Lynn] use Plaintiff Margaret's [] land. Margaret is family, additionally, she allows us to use the property and has deeded it to us in a beneficiary deed in the event of her death." Margaret further swore that Lynn and Jared "operate my family farm." Lastly, in a deposition, Lynn admitted that Margaret *owned* about 470 acres. At trial in this action, Lynn testified that his prior deposition testimony was correct because Margaret "owned title" while he "own[ed] possession."[7] This uncontested evidence establishes that Appellants' use of the disputed property had been and continued to be permissive, not hostile, in 2009 because Appellants voluntarily, knowingly, and intentionally continued to recognize Margaret as the titleholder of the disputed property. *See Newbill v. Forrester-Gaffney*, 181 S.W.3d 114, 120 (Mo.App. 2005); *White*, 506 S.W.3d at 390.

Because Appellants failed to adduce substantial evidence supporting the "hostile" element of their adverse possession claim to the disputed property for any requisite ten-year period, they did not make a submissible case, which requires all five adverse possession elements be supported by substantial evidence.[8] *See White*, 506 S.W.3d at 388; *Delacroix*, 407 S.W.3d at 26. The trial court did not err in granting Respondents' motion for JNOV on this basis. Appellants' point is denied.

---

[7] This testimony illustrates Appellants' misapprehension of the nature of an adverse possession claim, which concerns the time at which legal title is divested from the record title owner and is vested in the adverse possession claimant. *See City of South Greenfield*, 591 S.W.2d at 161. Both cannot hold legal title at the same time. An adverse possession claimant's voluntary, knowing, and intentional recognition and assertion that another has legal title to property is inconsistent and incompatible with that claimant's assertion that he or she has acquired that legal title by adverse possession. The two assertions are mutually exclusive. *See, e.g.*, *Reinheimer*, 327 S.W.2d 823, 831 (Mo. 1959) (claim of dower not only falls short of a claim of unequivocal ownership or title, but it is inconsistent with such a claim). Similarly, Appellants' claim to "own possession" of the disputed property falls well short of a claim of unequivocal ownership and title in the face of Margaret's admitted continued ownership of legal title.

[8] Because the hostile element of Appellants' adverse possession claim was not supported by substantial evidence and thereby defeats their claim, we need not address Appellants' arguments in their point as to whether other elements of their claim were supported by substantial evidence.

## Decision

The trial court's judgment is affirmed.[9]

GARY W. LYNCH – OPINION AUTHOR

DON E. BURRELL, JR., P.J. – concurs

NANCY STEFFEN RAHMEYER, J. – concurs

---

[9] Because we affirm the trial court's judgment, we need not and do not address Respondents' cross-appeal challenging the trial court's denial of their Motion for New Trial.