James P. CHARLTON and Ruth M.
Charlton, Plaintiffs-Appellants,

v.

Tommie CROCKER and Alice Crocker,
Defendants-Respondents.

No. 13147.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 13, 1984.

Jack A. Bennett, Camdenton, for plaintiffs-appellants.

W. Gary Drover, Camdenton, for defendants-respondents.

TITUS, Judge.

This is a suit involving ownership and possessory rights to three contiguous lots in a platted subdivision situate in Camden County, Missouri. In those parts of their petition which spawned the issues germane to this appeal plaintiffs alleged a right to possession and sought recovery of the property in question (Count I) and prayed that title to said property be quieted in them (Count II). Defendants in answer denied that plaintiffs have any ownership or possessory interest in the disputed premises and asserted by way of counterclaim that they, defendants, are the fee owners of said premises by virtue of adverse possession. The case was tried to the court sitting without a jury and judgment was rendered for defendants. From this judgment, vesting title to the property in defendants, plaintiffs have appealed.

Plaintiffs, husband and wife, base their claim to the disputed land on three warranty deeds executed on July 31, 1981, each of which conveyed one of the three constituent lots.[1] Defendants, husband and wife, base their claim upon title acquired by adverse possession of the land for the ten-year period prescribed by § 516.010.[2]

The land in question consists of lots 9, 10, and 11 in Revelation Subdivision, dedicated and developed by Frank and Bertha Heise. In April of 1971 defendants Tommie and Ruth Crocker purchased and moved onto adjacent lots 7 and 8, where they established their residence in a two-bedroom house. Within that month a number of fires broke out in the subdivision, posing a threat to but never actually harming the Crocker home.[3] As their trial testimony reflects, defendants considered the brush-covered condition of lots 9, 10, and 11 a danger to their property and desired that the neighboring lots be cleared sufficiently to minimize the risk of fire.[4]

To that end they contacted Mrs. Heise as well as the attorney for the subdivision and the Camden County prosecutor. According to Mr. Crocker, both Mrs. Heise and the subdivision's attorney acknowledged that the condition of lots 9, 10, and 11 presented a fire hazard and opined that it would be all right if defendant cleared them himself. The prosecutor was said to have advised that defendant could not get into any trouble for clearing the lots and that, "if [the record owners] don't pay you for your labor, after ten years you could claim [the property]." The prosecutor also informed

---

1. Plaintiffs acquired lot 9 from Wilbur and Binda Adams, husband and wife; lot 10 from Gary and Ann Adams, husband and wife; and lot 11 from Mark and Janet Adams, husband and wife. The Adamses were the record owners of lots 9–11 throughout quite nearly the entire period during which defendants purport to have claimed them.

2. References to statutes are to V.A.M.S.

3. On one occasion some neighbors of defendants fought a fire to keep it from defendants' house and that of another resident of the vicinity.

4. Mr. Crocker testified that at the time he and his wife moved onto their lots the vegetation on lots 9, 10, and 11 ranged in height from one and a half to eleven feet. The lots were also covered with debris, including piled brush and leaves, discarded beverage cans and bottles, and assorted other refuse.

Mr. Crocker of the availability of the mechanic's lien as a device to secure payment for labor done on the lots. Before commencing work on the property defendants again consulted Mrs. Heise, who reiterated her previous "authorization" to do so.

Defendants initiated clearing in April, 1971, with what Mr. Crocker described as "a chopping axe and a grubbing hoe." Sometime later that year—the rather underdeveloped record does not indicate specifically when—Mr. Crocker began to remove vegetation with the aid of a "brush hog" and a tractor. He testified that his son, grandson, sister-in-law, and brother-in-law assisted in the clearing effort at various times (not subject to specific recollection by defendant) by removing brush, raking leaves, picking up rocks, etc. Further, defendant hired one Carl Coffee to "brush hog" the lots on a number of occasions. The record is not as complete as it might be with respect to this activity but it appears that brush-hogging was done "every year" over the six years next preceding trial.[5] Mr. Crocker testified to having done some brush-hogging himself—"three or four times"—over the years. Additional acts of clearing by defendants included the extraction of tree stumps, the removal in 1972 of seven pick-up truckloads of trash, and the removal of what defendant estimated to be 35 to 40 tons of rock. Defendants also installed a water line across the property sometime in 1974 or 1975; seeded, fertilized, and limed the property in the fall of 1980; and constructed a fence along the north and south sides of the property in early 1981.

Aside from defendants' clearing activity, their ostensible exercise of dominion over the property included the placement thereon of certain items of personalty. Among these were a flat-bed trailer, left on the property for approximately one year (the year immediately prior to trial); a bulldozer used to remove stumps, left for a time during 1981; axles and wheels, left some-

where on the lots for three months in 1981; and three 55-gallon drums used as trash barrels, placed on the property at the inception of defendants' "occupancy" and still there as of the time of trial.

The foregoing catalog of acts performed on the property by defendants does not include such evidence as would indicate what defendants regarded to be the legal significance of those acts. Inasmuch as this issue is the focal point of our discussion, infra, testimony adduced in regard thereto is here presented at some length.

Mr. Crocker testified that since 1971 whenever he had been asked about ownership of the disputed lots and whether they were for sale he had responded by saying they were his and were not for sale. He did not, however, allude to any specific occasions on which such communications took place. He further testified to having once told Carl Coffee that plaintiff Mr. Charlton tried to buy the lots "out from under me" and to having told Mr. Charlton that he, defendant, was claiming the lots and would build a house on them someday.

As mentioned, supra, the record indicates that the *sine qua non* to defendants' commencement of activity on the property was that it presented a fire hazard to their lots 7 and 8. On four disparate occasions during trial defendants testified to this effect, stating that their original purpose in clearing the disputed property was to protect their home from fire.

Also relevant to Mr. Crocker's "attitude" toward his performance of work on the property is the following exchange, excerpted from his testimony on cross-examination:

Q: [by Mr. Foster]: And you expected to get paid for that [the work on lots 9–11], didn't you? You mowed someone else—

A: To claim title to the land.

Q: Answer my question.—You expected to get paid for it?

---

5. The date of trial, which served as a reference point for much of the testimony, was September 27, 1982.

A: Paid for it by title to the land.

\* \* \* \* \* \*

Q: And you expected to get paid for that, didn't you? For the work that you did on that property?

A: From someone, or the title.

Mr. Crocker testified that he tried to get the Adamses, the record owners until July 31, 1981, to clean up the lots, to "let somebody else do it, hire them or let me do it or sell me the lots" and that he sent a letter to them—the record is silent as to whom specifically—requesting as much. Asked when he sent this letter defendant responded, "It started in April of '71."

On or about April 19, 1982, Mr. Crocker filed a mechanic's lien against lots 9–11 which stated as the basis for the $4275 "debt" secured the various items of labor performed by defendants on the property since 1971. The lien also recited the following:

This [i.e., the assertion of a lien] is the result of the advice of the prosecuting attorney's office in April, 1971 when I could not get an answer from the Adams's (sic) on the condition of the property or what they would do about cleaning it up. Wilbur Adams promised to come and talk to me and he never did.

Mr. Crocker could not recall exactly when Adams made this promise, only that he did so "before five years ago," i.e., before September of 1977. Sometime prior to filing the lien, Mr. Crocker sent the Adamses a handwritten statement dated September 23, 1981, which set forth the specific acts of labor performed by defendants on lots 9–11 and requested payment of $4275. Plaintiffs received such a bill on or about April 19, 1982.

On redirect examination defendants' attorney sought to clarify what Mr. Crocker's intention had been in filing the lien. Defendant stated his aim had been "[t]o get paid for the work that I had done on the lots or get title to it (sic)." When asked on cross-examination why for the five years between the date the letter was sent to Adams and the date the lien was filed he

had done nothing to obtain payment for his work, Mr. Crocker responded: "because [Adams] said he would come and see me and he never did."

Mr. Crocker testified that he paid no taxes on lots 9–11 for any of the ten years during which he purports to have asserted his claim. He stated that instead of paying the taxes he "went to see if they were paid." Mr. Charlton testified that he paid taxes on the lots for 1981, the first year of his record ownership.

Defendant Ruth Crocker's testimony also includes statements which reflect upon the nature of defendants' claim to the lots. It appears therefrom that in 1971 defendants bought a mobile home which they placed on their lots 7 and 8 and which they used as a residence. When asked on direct examination why defendants sold this mobile home in the fall of 1978, Mrs. Crocker responded, "we had to delete [it] because it was sitting so close to the property line that we could not build or add onto the back of it because it was only about six feet from the property line of lot 9." Twice during cross-examination of Mrs. Crocker inquiry was made as to defendants' reason for selling their mobile home and on both occasions she stated that they could not build onto the back of it because it was too close to the property line.

Plaintiffs argue that notwithstanding the above-chronicled clearing activity of defendants on lots 9–11 a case of adverse possession was not fully established. Essentially, each of plaintiffs' three points relied on assigns as error the trial court's determination that a particular element of adverse possession was satisfied.

■ We begin our consideration of plaintiffs' points with an examination of the relevant legal principles. In *Counts v. Moody*, 571 S.W.2d 134 (Mo.App.1978), the court succinctly summarized the primary attributes of the law of adverse possession as follows:

Parties seeking to establish [title by adverse possession] have the burden of establishing all of the elements [thereof]. These elements are clearly and consist-

ently defined by the courts of this state as (1) the possession must be hostile, that is, under claim of right; (2) actual; (3) open and notorious; (4) exclusive; and (5) continuous, over the statutory period. For the purpose of testing whether such burden has been met, acts which constitute adverse possession depend upon the facts of each particular case, and consideration is given to the nature and location of the property, the uses to which it is put, the intent of the parties and those under whom they claim, and all other facts and circumstances of the possession and use. *Id.* at 138[4, 5]. (Citations omitted.)

For a more elaborate discussion of the various elements of adverse possession see *Teson v. Vasquez,* 561 S.W.2d 119 (Mo.App. 1977). It has been stated that proof of adverse possession must be by clear, distinct, and unequivocal evidence, *Crider v. Meatte,* 320 Mo. 474, 485, 7 S.W.2d 691, 694–695[12] (1928), and that the failure to prove any one element of adverse possession prevents the ripening of title thereby. *Eaton v. Curtis,* 319 Mo. 660, 669, 4 S.W.2d 819, 822[3] (1928). It is also noteworthy that one claiming title on the basis of adverse possession need not have been in good faith in occupying or otherwise exercising dominion over the property to which he asserts a claim. *Wilkerson v. Eilers,* 114 Mo. 245, 253, 21 S.W. 514, 515 (1893).

Plaintiffs contend, inter alia, that the trial court's finding of adverse possession was against the weight of the evidence in that it included a determination that defendants in fact asserted the requisite claim of right to lots 9–11. Specifically, plaintiffs point to three distinct and affirmative actions of defendants, each of which is said to have evinced a recognition on their part that, despite their dominion over

and "affected" claim to the property, title thereto was actually held by others.

■ We turn to *Teson v. Vasquez,* supra, for a capsule exposition of the applicable law. With respect to the hostility or claim of right element, the court in *Teson* observed that

Naked possession asserted for any period of time, no matter how lengthy, is insufficient to ripen into adverse possession. For possession to be hostile it is neither required that the true owner have knowledge of the hostile claim of right or (sic) that the claimant intend to deprive him of title. The possesion must be opposed and antagonistic to the claims of all others, i.e., the claimant must occupy the land with the intent to possess it as his own and not in subservience to a recognized, superior claim of another. Furthermore, the claim of right or ownership must be unequivocal. *Id.* at 127[15–17] (Citations omitted.)

The first of the three actions alluded to, supra, occurred in April of 1971 at the inception of the relevant ten-year period, when defendants requested permission from the subdivision owner to work on lots 9–11. We recount that such a request was made on more than one occasion, the most recent immediately prior to defendants' commencement of activity on the property. That defendants sought permission to work on the lots—even from someone arguably without such interest in them as would confer upon her authority to grant permission—strongly suggests that, as of that time, defendants were not asserting the unequivocal claim of ownership required in order for title by adverse possession to ripen.[6] Cases such as *Bach v. Standard Oil Co.,* 345 S.W.2d 144 (Mo.1961), and *Riebold v. Smith,* 150 S.W.2d 599 (Mo.App.

---

**6.** It is important for purposes of this analysis to note that defendants' requests for permission to work on the lots are not relevant in the sense contemplated in those cases holding that permissive possession is inimical to adverse possession. See, e.g., *John v. Turner,* 542 S.W.2d 293, 300[4] (Mo.App.1976); *Bollinger v. Henry,* 375 S.W.2d 161, 164[4] (Mo.1964); *Eaton v. Curtis,*

319 Mo. 660, 668, 4 S.W.2d 819, 822 (1928). That is because in the instant case permission was not sought from those to whose interest the claim in question was adverse. As explained in the textual discussion, the requests for permission in this case are relevant only to the extent they betrayed a belief on defendants' part that the lots in dispute were not theirs to occupy.

1941), the latter of which will be discussed more fully, infra, indicate that even seemingly trivial acts of equivocation on the part of an adverse possessor may vitiate his claim.

■ Inasmuch as defendants' request for permission to work on the lots was made of someone other than the record owner, we feel obliged to explain that it is not necessary, in order for an adverse possession claim to fail for want of hostility, that the claimant believe title to be held by the record owner as such. It is enough that he be doubtful as to his own right to the property. This much is evident from those cases holding that possession of land in recognition of a lack of title is insufficient to ripen into title by adverse possession, *John v. Turner*, supra note 6, at 300[3]; *Reinheimer v. Rhedans*, 327 S.W.2d 823, 831[9] (Mo.1959); *Riebold v. Smith*, supra at 602[5],[7] and can be negatively inferred from the following language in *State ex rel. Edie v. Shain*, 348 Mo. 119, 123, 152 S.W.2d 174, 176–177[5] (1941): "It is not necessary that [the claimant] intend to take away from the true owner something which he knows belongs to another, or even that he be indifferent as to the facts of the legal title. It is the intent to possess, and not the intent to take irrespective of his right, which governs."

■ One other observation must be made concerning defendants' requests for permission to clear the lots. While it is true that such requests, as evidence of an absence of hostility, may be rendered irrelevant by a subsequent categorical assertion of right on the part of the adverse claimant,[8] such a situation did not obtain in

this case. Defendants had the burden of establishing the existence for the statutory period of all the elements of adverse possession. *Counts v. Moody*, supra at 138[4]; *Teson v. Vasquez*, supra at 125[1]. The evidence allows for no other conclusion than that such period extended from 1971 to 1981. There appears no evidence, save defendants' references at trial to their subjective claim to the property as of 1971, of such a positive, unequivocal act as would counter the inference to be drawn from their requests for permission that they did not actually believe themselves to have a right to the property.

The second significant intent-probative action of defendants was the sale of their mobile home in the fall of 1978. Mrs. Crocker thrice testified that she and her husband sold their mobile home when it became apparent that they could not build or otherwise add onto it because it was positioned too close to the property line of lot 9. Defendants' fear of encroachment upon that property presupposed a belief on their part that they were without right to do so. Such is the essence of the kind of equivocal claim that courts of this state have refused to recognize as sufficient for purposes of adverse possession.

In *Riebold v. Smith*, supra, defendants were record owners of several adjacent lots near but not abutting Big River. Conceding that they had never obtained a deed to any of the land between the river and their numbered lots, defendants nevertheless asserted a right to such property on the basis of adverse possession. Sometime during the limitation period defendants desired to place the record title to their property in

7. The court in *Riebold* described it as "essential" that a claim of ownership or title be "maintained for the full period of limitation without *any* disclaimer of title on [the part of the adverse claimants] or recognition of title in *any one other than themselves*." (Emphasis supplied.)

8. "An adverse claim must be hostile at its inception. The phrase 'hostile in its inception' does not relate to the original entry of the disseisor, but to the act by which the possession became adverse; in other words, the possession must

have been hostile for the statutory period. Thus the original entry need not always be of a hostile character.... [W]here the original entry is not adverse, it does not become so and the statute does not begin to run as against the rightful owner until the adverse claimant disavows the idea of holding for, or in subserviency to, another and actually sets up an exclusive right in himself by some clear, positive, and unequivocal act brought home to the owner." 3 Am.Jur.2d, Adverse Possession § 33, pp. 117–118.

the name of one of their daughters. To accomplish this objective they arranged for the contemporaneous execution of two deeds, one to convey the property from themselves to their daughter, the other to convey the property from their daughter to themselves. Only the former conveyance was to be recorded. When the plan was implemented neither of the two deeds included in its description any property other than the numbered lots to which defendants indisputably held title. The significance of defendants' failure to include the adversely claimed property was not lost on the court:

> This transaction between defendants and their daughter, having been limited to a conveyance of merely the platted lots, carried with it its own obvious implication, which was that at the time of such transaction, which occurred within the period of years relied upon for the perfection of title by adverse possession, defendants did not claim title to any land except the platted lots conveyed. In other words, their own manner of describing their property was a recognition of the fact that they had no title to the unmentioned tract lying between their lots and the river, and by the same token necessarily amounted to an admission on their part of the existence of a paramount title in some one other than themselves. *Id.* at 602.

We are of the opinion that defendants' reason for selling their mobile home is no less telling a manifestation of irresolution than was the claimants' omission in *Riebold*. That Mrs. Crocker's candid revelation of the former may very well have been inadvertent only lends strength to its character as a window on the minds of defendants, as claimants. Certainly the *Riebold*

defendants did not intend for their seemingly slight preterition to constitute the kiss of death to their claim.[9]

The last of defendants' three displays of tergiversation occurred in April of 1982 when Mr. Crocker filed a mechanic's lien against the disputed property to secure payment for the work he and his wife had done thereon. The trial court determined that the assertion of this lien was not prejudicial to defendants' adverse possession claim inasmuch as such action is within the ambit of the following principle, enunciated in *Mather v. Walsh*, 107 Mo. 121, 131, 17 S.W. 755, 757 (1891), and relied upon more recently in *Feinstein v. McGuire*, 297 S.W.2d 513, 517[7] (Mo.1957), and *Jurgensmeyer v. Yoest*, 647 S.W.2d 808, 810[3] (Mo.App.1982): "A direct purchase of any ostensible *title* by one in possession has no ... force as an admission. A party in possession of land may *fortify* his right *thereto* by acquiring any outstanding interest *therein*, without thereby weakening the force or effect of his possession." (Emphasis supplied.)

With due respect to the court below, we think that *Mather* is inapposite. The assertion of a lien against property does not constitute the acquisition of an outstanding interest in that property. On the contrary, the effectiveness of a lien as a security device depends upon its nature as a *charge upon* property *of another*, i.e., the debtor. *Ladue Contracting Co. v. Land Development Co.*, 337 S.W.2d 578, 584[5] (Mo.App. 1960); *Koenig v. Leppert-Roos Fur. Co.*, 260 S.W. 756, 758[5] (Mo.App.1924).[10] That defendants may have filed the lien merely to "cover themselves" in the event their adverse possession claim failed simply underscores the provisional and contingent nature of their posture vis-a-vis the proper-

**9.** See *Bach v. Standard Oil Co.*, 345 S.W.2d 144, 146–147 (Mo.1961), for another example of the kind and degree of irresolution sufficient to preclude acquisition of title by adverse possession.

**10.** In *Koenig* the court stated that "[a] lien is not a property in or right to the thing itself, but

constitutes a charge or security thereon." See also § 429.010, which provides that a mechanic's lien, where applicable, shall be "upon such building, erection or improvements [constructed by the lienor], and *upon the land belonging to such owner or proprietor on which the same are situated ....*" (Emphasis supplied.)

ty in question. The numerous cases [11] requiring an *unequivocal* claim of right on the part of an adverse possessor make it clear that such mugwumpery is fatal to an adverse possession claim.

It may be urged that, as defendants did not file the mechanic's lien until after the ten-year period in question, hence, after title to the property would have ripened, such action is irrelevant to the issue of whether defendants' possession was of a hostile character. The answer to this contention may be found in *Bridle Trail Assoc. v. O'Shanick*, 290 S.W.2d 401, 407[10] (Mo.App.1956), wherein the court noted that "a request [for permission to use the property of another], made even after the expiration of the period of limitation, has been characterized as 'important,' 'strong,' 'very powerful' evidence tending to show that the prior possession was not adverse." See also 3 Am.Jur.2d, Adverse Possession § 251, pp. 349–350. Insofar as a request for permission to use the property of the record owner demonstrates a failure on the part of the adverse possessor unequivocally to claim that property, it is of a piece with defendants' filing of a lien against the lots they herein purport to have claimed. Application of *Bridle Trail* to the facts of the instant case is therefore warranted.

Our review of this case has left us with the suspicion that defendants, informed of a wonderful land acquisition device called "adverse possession", were purposely attempting to establish its elements with respect to the disputed property. While it is true, owing to the absence of a good faith requirement, that one may acquire property of another by means of a knowing and deliberate satisfaction of all the requirements of adverse possession, one of those requirements is that the adverse possession be under an *unequivocal* claim of right. In that connection, the three actions discussed, supra, are collectively something of a Pinocchio's nose on the otherwise ingenuous countenance of defendants' claim.

Inasmuch as our disposition of the claim of right issue spells doom for defendants' case of adverse possession, it is unnecessary for us to address plaintiffs' other assignments of error. The judgment is reversed and the cause remanded with directions to the trial court to enter judgment for plaintiffs, awarding them possession of the property in question and quieting in them title to same.

FLANIGAN, P.J., GREENE, C.J., and CROW, J., concur.

**11.** See, e.g., *Sandy Ford Ranch, Inc. v. Dill*, 449 S.W.2d 1, 4[1] (Mo.1970); *Reinheimer v. Rhedans*, 327 S.W.2d 823, 831 (Mo.1959); *Landers v. Thompson*, 356 Mo. 1169, 1173, 205 S.W.2d 544, 546[4] (1947); and *Bell v. Barrett*, 76 S.W.2d 394, 396[2] (Mo.1934).