**Carl UNDERWOOD and Nancy Underwood, Plaintiffs–Appellants,**

**v.**

**Thomas HASH and Debra Hash, Defendants–Respondents.**

**No. 24280.**

Missouri Court of Appeals, Southern District, Division Two.

Feb. 26, 2002.

---

K. Patrick Douglas, Douglas, Lynch, Haun & Kirksey, P.C., Bolivar, for Appellant.

John A. Parks, Humansville, for Respondent.

PHILLIP R. GARRISON, Presiding Judge.

Carl and Nancy Underwood (collectively referred to as "Plaintiffs," or "Plaintiff Underwood" when referring to Carl Underwood) filed suit seeking to quiet title to certain real property in Hickory County (the "disputed tract"), and ejectment of Thomas and Debra Hash (collectively referred to as "Defendants," or "Defendant Hash" when referring to Thomas Hash) from that property. Defendants filed a counterclaim in two counts, one for quiet title on the basis of adverse possession of the disputed tract, and one for trespass. The trial court entered judgment against Plaintiffs on both of their counts and in favor of Defendants on their count for adverse possession and against them on their count for trespass. Plaintiffs appeal.

Plaintiffs' land is contiguous to and south of Defendants' land. Plaintiffs have record title to the disputed tract which is bounded on the north by Plaintiffs' record line, and on the south by the fence erected by Defendants. Thus, the disputed tract is an area that is north of an existing fence and south of Plaintiffs' northern record line. Prior to 1987, the properties now owned by Plaintiffs and Defendants were commonly owned by Morris and Wilma King ("the Kings"). Defendants purchased their tract from the Kings in April 1987. About a week prior to their purchase of the property, Defendant Hash and Morris King measured the property, and agreed where the corners were to be. Defendant Hash agreed to build a fence, which he did within a month after the purchase. Defendant Hash placed the fence on a line between the corners agreed to by himself and the Kings, and on what he believed to be the southern boundary line of his property. Thereafter, Defendants used the disputed tract to graze cattle every year, to grow and bale hay, to pick walnuts, and to take off fescue seed. Defendants also fertilized the disputed tract every year, and also maintained the fence by replacing posts and by splicing wire after the fence was broken by bulls and tree limbs. The location of the fence was never changed.

Plaintiffs purchased their property from the Kings in October 1987. Upon viewing the fence line between the parties' properties, Plaintiff Underwood said that he believed the fence was not on the true boundary line. He said that he spoke with Defendant Hash a couple of times, asking if he thought the fence was in the right place. He said that Defendant Hash said very little, but something like "I think it's in the right place." He also said that Defendant Hash was generally noncommittal. Plaintiffs subsequently had their land surveyed in 1990. The survey showed that the east-west fence line was south of Plaintiffs' north property line anywhere from 19.7 feet near the middle of the strip to approximately 4.4 feet on the west and 11.5 feet on the east side of the strip. In late December 1995 or January 1996, Plaintiff Underwood called Defendant Hash and told him he was sending him a copy of the letter from his attorney and a copy of the survey. Three days later, Plaintiffs sent Defendants a letter from their attorney and a copy of the survey. In pertinent part, the letter, which was addressed to Plaintiffs and forwarded to Defendants, read:

> You had provided me with a copy of a Plat of Survey, a copy of which is attached to this letter. I have reviewed the document which reflects both the current fence lines and the surveyed boundaries of the property. The survey also reflects the existing county roads which have an easement over the property on both the south and the east sides. In particular, I directed my at-

tention toward the north boundary which reflects an existing fence that would appear to have been constructed some 4.4 ft. to 11.5 ft., and even to the extent of 19.7 ft., inside of the surveyed boundary.

It is my opinion that you retain ownership to the ground inside of the surveyed boundary. You may continue to allow the use of the ground by the abutting land owner. This does not place you in any jeopardy of losing the ownership to the ground. I do suggest that you forward to [sic] copy of my opinion letter and the survey to the abutting owner. At the time any fence work is done or reconstructed, it would of course be advisable to return it to the surveyed line.

Again, I suggest you forward this letter to the owner, particularly on the north, together with the survey.

After a bench trial, the trial court entered judgment against Plaintiffs on both of their counts, and in favor of Defendants on their count for adverse possession and against them on their count for trespass. Plaintiffs appeal.

■ An appellate court is to sustain a judgment entered in a court-tried case unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Warren v. Tom*, 946 S.W.2d 754, 757 (Mo.App. S.D. 1997). All evidence favorable to the judgment and all inferences to be drawn from the evidence are accepted as true, and all contradictory evidence is disregarded. *Brinner v. Huckaba*, 957 S.W.2d 491, 494 (Mo.App. E.D.1997). Credibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part, or all of the testimony of any witness. *Keller v. Friendly Ford, Inc.*, 782 S.W.2d 170, 173

(Mo.App. S.D.1990). We may not substitute our judgment for that of the trial court on credibility issues. *Id.*

■ Significantly, the record before us does not indicate that either party requested the trial court to make findings of fact or conclusions of law. Where none are requested or entered by the trial court, all fact issues are to be considered found in accordance with the result reached. *In re Estate of Campbell*, 939 S.W.2d 558, 562 (Mo.App. S.D.1997). Under such circumstances, the judgment is to be upheld on any reasonable theory within the pleadings and supported by the evidence. *Schaefer v. Rivers*, 965 S.W.2d 954, 956 (Mo.App. S.D.1998).

■ To establish title to land by adverse possession, a claimant must prove by a preponderance of the evidence that his possession of the land was (1) hostile and under a claim of right; (2) actual; (3) open and notorious; (4) exclusive; and (5) continuous for a period of ten years. *Flowers v. Roberts*, 979 S.W.2d 465, 469–70 (Mo. App. E.D.1998). The failure to establish any one of the elements will necessarily defeat the claim. *Id.* at 469.

On this appeal, Plaintiffs' first two points relied on deal with the issue of whether Defendants' possession of the disputed tract satisfied the element that it be hostile and under a claim of right. In the first, Plaintiffs contend that Defendants possessed the disputed tract with knowledge that they did not hold title and they did not make an unequivocal claim of right. In the second, they contend that Defendants admitted that when the fence was constructed they did not intend to claim property for which they had no deed and did not own, and that they did not expect to claim more than the amount of acreage that their deed described. We discuss

these two points in conjunction with each other.

"Hostile" means a possession antagonistic to the claims of all others, with an intent to occupy as one's own. *Weaver v. Helm,* 941 S.W.2d 801, 804 (Mo.App. S.D.1997). Under the "hostile" element, even if the possessor mistakenly believed he had title and occupied the land as his own, the element is satisfied. *Id.* While the "hostile" element includes claims that are antagonistic to the claims of all others, it does not imply animosity. *Id.* at 805. It is the intent to possess not the intent to take away from the true owner that governs. *Id.* at 804. "The possession must be opposed and antagonistic to the claims of all others, i.e., the claimant must occupy the land with the intent to possess it as his own and not in subservience to a recognized, superior claim of another." *Id.* at 805.

Plaintiffs argue that Defendant Hash made admissions during cross-examination that are dispositive here in that he allegedly conceded that he did not have a claim of right. This contention arises from Defendant Hash's testimony that the survey given to him by Plaintiff Underwood indicated that the true boundary line was not the fence line; he had no reason to doubt the survey; the survey indicated that the true line was north of the fence; the survey indicated that the fence line encroached on the Plaintiffs; the survey indicated that the Plaintiffs were the record owners of the disputed tract; and that he understood that the survey indicated that Plaintiffs were the record owners of the disputed tract. When asked if he understood after receiving the survey that Plaintiffs were the record title owners of the disputed tract, Defendant Hash said that he "understood that's what the survey said." From this testimony, Plaintiffs conclude that Defendant Hash admitted the absence of Defendants' title and the paramount title of Plaintiffs.

Plaintiffs liken the above testimony to that in *Riebold v. Smith,* 150 S.W.2d 599 (Mo.App.St.L.1941), which resulted in a reversal of a judgment finding title by adverse possession. There, the disputed property consisted of lots in a subdivision that were not included in a deed by the adverse claimants by which they conveyed other lots. The court said that it was not only necessary that the claimants enter into possession under a claim of ownership, but that they maintain that claim throughout the period of limitation without any disclaimer of title or recognition of title in any one other than themselves. *Id.* at 602. The court concluded that the record was insufficient to support a judgment for the claimants, saying that when they undertook to convey the record title to all they owned without including the disputed tracts in that conveyance, it could not be said that their possession of the disputed tract was hostile and adverse to the true owner. *Id.* at 603. Rather, the court said that the conveyance carried with it an obvious implication that the claimants did not claim title to any land except the lots conveyed, and was an admission of the existence of a paramount title in others. *Id.* at 602.

In the instant case, however, the trial court was not compelled to place the same interpretation on the evidence as do Plaintiffs. The statements of Defendant Hash relied on by Plaintiffs do not necessarily mean that he had acknowledged a superior title or claim of right to the land over that of Defendants. Rather, a reasonable interpretation of the evidence could well be that Defendant Hash was merely acknowledging what the survey showed, without indicating an agreement with its results or effect.

Plaintiffs also cite *Charlton v. Crocker*, 665 S.W.2d 56 (Mo.App. S.D.1984), where the appellate court reversed a judgment finding title by adverse possession because the evidence did not establish that the adverse possession was under an unequivocal claim of right. *Id.* at 63. There, however, the parties claiming adverse possession had requested permission to work on the disputed property; had sold a mobile home because they could not build onto it for fear of encroaching on the disputed property; and had placed a mechanic's lien on the property in dispute. *Id.* at 60–62.

Plaintiffs draw a correlation between *Charlton* and this case based on three contacts between Plaintiff Underwood and Defendant Hash. First, they point out that Plaintiff Underwood stopped Defendant Hash on the road prior to January 1996 and told him he was having his north property line surveyed, but that Defendant Hash said nothing in return about the fence line. Next, they point out that Plaintiff Underwood called Defendant Hash and told him that he was sending him a copy of a letter from their attorney and a copy of the survey, and that Plaintiffs' north line was off and that he was going to move the fence at a later date. Again, they point out that Defendant Hash made no response defending the fence as the boundary line, or specifically that he claimed the disputed tract. Finally, Plaintiffs point to the fact that Defendant Hash admitted receiving from Plaintiffs the letter addressed to Plaintiffs from their attorney quoted earlier in this opinion, a copy of the survey, and that he testified as outlined above.

Defendant Hash also testified that prior to a 1999 conversation with Plaintiff Underwood, he never told Plaintiff Underwood that the surveyed line was or wasn't the true boundary line. In October 1999, Plaintiff Underwood told Defendant Hash that he was going to move the fence, whereupon, Defendant Hash told him that the latter's attorney was going to be writing him and that he should wait to receive that correspondence.[1]

Contrary to Plaintiffs' assertions, the trial court was not required to interpret Defendant Hash's actions as being a positive manifestation that he did not believe that he had a right to the disputed tract. In fact, Defendant Hash testified that he had built the fence after he and his predecessor in title had measured the property and agreed that was where the fence should be. He said that, "I thought the land was mine up to the fence." Plaintiff Underwood also testified that when he first talked with Defendant Hash, he asked Defendant Hash whether he thought the fence was in the right place, and the latter said very little except "I think it's in the right place, or something to that effect." There were no requests for permission or other positive actions implying an acknowledgement that Defendants had no right to the disputed tract as described in *Charlton*. Accordingly, that case does not require a reversal.

Plaintiffs also argue that the "hostility" element of adverse possession is lacking here because Defendant Hash admitted that when the fence was constructed they did not intend to claim property for which they had no deed and did not own, and did not expect to claim more than the amount of acreage their deed described.

In support, Plaintiffs point out that Defendant Hash testified as follows on cross-examination:

that was bisected by the fence, referred to more specifically *infra*.

---

1. This communication related to Plaintiff Underwood's plan to change a dam on a pond

Q. At the time you measured the land you intended to possess only the land that you had title to?

A. Yes.

Q. In building the fence you were not intended to acquire title to property that you didn't own?

A. No. I was fencing what I believed I owned.

Q. At the time you constructed the fence you did not intend to claim property for which you had no deed?

A. That's right.

   *     *     *     *     *     *

Q. You didn't expect to have more acreage in actuality than your deed represented that you had?

A. Oh no.

Plaintiffs liken this testimony to that in *Norman v. Allison*, 775 S.W.2d 568 (Mo. App. S.D.1989), which was fatal to the adverse possession claim considered there. There, the claimant testified that he had consulted with the record owners about where to put a fence. When asked whether, in building that fence, he was claiming property that he did not have a deed to, he said, "I was merely building a fence," and when asked the question, "You did not intend to claim some property that you did not have a deed for but you were just going to build a fence?" he said, "I guess that would be right." *Id.* at 571. The *Norman* court noted the trial court's finding that there was positive proof that the claimant's possession was not hostile and under a claim of right, and said that claimant's admissions standing alone constituted substantial evidence to support the judgment. *Id.* at 573. The court there also said that the intent with which a claimant must possess real property to establish title by adverse possession is an elusive element, but said:

The sufficiency of the claim by one in possession is not to be measured by the morality of that claim or the legal efficacy of an instrument under which the claim is made. Nonetheless, it must be an intent to claim to possess the land as the owner.

*Id.* at 572. It also quoted from *Anson v. Tietze*, 354 Mo. 552, 190 S.W.2d 193, 196 (1945), in saying:

The rule is that while one's occupancy of an adjoining proprietor's land under a mistake as to the boundary line, and without any intention of claiming beyond the true boundary line, when ascertained, is not adverse possession, yet if he takes and holds possession up to a given point, and claims to be the owner to such point, his possession is adverse, notwithstanding his belief that such point is the true boundary line, when in fact it is not.

*Norman*, 775 S.W.2d at 573. Finally, the *Norman* court said that Missouri has joined other jurisdictions by announcing that the exclusive possession and use of land is presumed to be adverse, absent positive proof to the contrary. *Id.* In deciding that the claimant's admissions were positive proof that his possession was not hostile, the court said, however, that each claim of adverse possession must be decided on its own unique facts. *Id.* Under the peculiar facts of that case, including the fact that the claimant had asked permission to build a road in question, the court said that his admission that he was "merely building a fence" had greater significance. *Id.*

Unlike *Norman*, here, there was no permission requested by Defendants. Additionally, unlike in *Norman*, here, in admitting that in building the fence he did not intend to acquire title to property that he didn't own, Defendant Hash added that "I was fencing what I believed I owned." He

made it clear that he had fenced and possessed land that he believed he owned and was entitled to. This alone distinguishes this case from *Norman*. Therefore, Points One and Two are denied.

■ In Point Three, Plaintiffs contend that Defendants failed to establish adverse possession for the requisite statutory period because their possession during a portion of the required period was with Plaintiffs' permission and, therefore, was not adverse. As Plaintiffs correctly point out, "[p]ermissive use is contrary to a showing of adverse possession as hostile possession is lacking." *Ross Farms, Inc. v. Moore*, 873 S.W.2d 308, 309 (Mo.App. S.D.1994). "[P]ermissive possession is inimical to adverse possession." *John v. Turner*, 542 S.W.2d 293, 300 (Mo.App.K.C.1976). Accordingly, Plaintiffs argue here that "the undisputed facts show permissive use by [Defendants]."

■ Plaintiffs point to the evidence that Plaintiff Underwood told Defendant Hash that he was going to have his north line surveyed, and that the latter made no remonstrance at that time. They also point to evidence that Plaintiff Underwood later told Defendant Hash that the north line was off, that he was going to move the fence at a later date, and that he was sending a copy of the survey and of a letter from his attorney. Again, they point out the evidence that Defendant Hash said nothing in return. Finally, Plaintiffs argue that "[t]he clear grant of permission comes in the third contact" when Plaintiff Underwood sent Defendant Hash a copy of his attorney's letter stating that Plaintiffs could "continue to allow the use of the ground ...," and that "[a]t the time any fence work is done or reconstructed, it would of course be advisable to return it to the surveyed line." They conclude that from this evidence, the trial court was compelled to find that Defendants' posses-

sion of the disputed tract was permissive, thereby destroying any claim of adverse possession.

Plaintiffs, by their description of the letter and survey sent to Defendants as a "clear" grant of permission, tacitly concede that the earlier two occurrences are less than "clear" as a grant of permission. In fact, the earlier contacts could be interpreted as nothing more than Plaintiff Underwood telling Defendant Hash that he questioned whether the fence line was on the true property line, and later, that he believed the fence was off the line and that he was going to move it at a later time. Plaintiff Underwood, in describing the first two conversations he said he had with Defendant Hash, said that Defendant Hash said something to the effect that he thought the fence was in the right place. Concerning Defendant Hash's statements about the fence, Plaintiff Underwood said that he was "non-committal."

According to Defendant Hash, the first conversation he had with Plaintiff Underwood about the issue was when the latter told him that he had already had the survey made, and that it showed that the fence was south of the property line. Defendant Hash said that he made no response concerning the fence at that time. According to the record, the survey was performed in January 1990. Defendant Hash said that the next time he had a communication from Plaintiff Underwood concerning the matter was three days before receiving a copy of the attorney's letter and the survey, when Plaintiff Underwood called and told him that the fence was off and that he was going to move it at a later time. Defendant Hash said that again, he made no response, and three days later, in January 1996, he received the copy of the attorney's letter and survey. When Plaintiffs' attorney attempted to get Defendant Hash to admit that the

attorney's letter amounted to an assent to his continued use of the disputed tract, Defendant Hash said that he didn't believe he needed permission to use that property because he believed that he owned it.

To extrapolate these contacts into a required finding of permissive use that would destroy a claim of adverse possession is stretching too far. First, the earlier contacts described by Plaintiff Underwood can hardly be described as the granting of permission to use the property. The letter written by Plaintiffs' attorney to them saying "[y]ou may continue to allow the use of the ground by the abutting land owner," even though sent to Defendants, does not require the conclusion that it amounted to an actual grant of permission by Plaintiffs.

▮▮▮ Plaintiffs' contention is premised on the conclusion that the communication of permission to a possessor of land by the record owner at any time during the limitation period for adverse possession prevents the possessor from acquiring title on that theory. In addition, they argue that Defendants' actions demonstrated that they acquiesced that their possession and use was subject to that authority. Plaintiffs, however, cite no authority for that proposition. Likewise, they offer no explanation for why such authority is not available. As a result, an appellate court is permitted to consider the point abandoned. *In re Marriage of Spears*, 995 S.W.2d 500, 503 (Mo.App. S.D.1999). For all of the above reasons, Point Three should be and is denied.

Plaintiffs' fourth point is premised on trial court error in failing to grant their motion for summary judgment because they contend that Defendants "tacitly admitted that their use of the [disputed tract] was with permission from [Plaintiffs] by virtue of their failure to respond to [Plaintiffs'] grants of permission." This point is without merit for at least two reasons.

▮▮▮ First, as indicated in our discussion of the preceding point, the trial court was not required to believe and conclude that Plaintiffs had granted permission to Defendants to use the disputed tract. Secondly, the denial of a motion for summary judgment is not an appealable order. *Rhodes v. Blair*, 919 S.W.2d 561, 564 (Mo.App. S.D.1996). As explained in *Parker v. Wallace*, 431 S.W.2d 136, 137–38 (Mo.1968), a trial court's action in overruling such a motion is not an appealable order because the issues raised by the pleadings are still in the case, and it is upon those issues, when decided and if timely and properly presented, that an appeal lies. This is of significance here because the matter for resolution in the appellate court is restricted to the issue raised in the point relied on. *See Thummel v. King*, 570 S.W.2d 679, 685 (Mo. banc 1978); *State ex rel. Wilson v. Brown*, 897 S.W.2d 171, 173 (Mo.App. S.D.1995). Point Four is therefore denied.

Plaintiffs' fifth point alleges error in entering the judgment because "possession by [Defendants] did not become adverse, for purposes of proving adverse possession, in that there was no proof of an express agreement between adjoining landowners or acquiescence in a fence as a boundary for a period of time sufficient to evidence a mutual acceptance of the dividing line as the common boundary by the adjoining landowners." They describe their contention under this point as follows: "... because of the nature of this action being a boundary dispute, [Defendants'] possession never became adverse as a result of a failure to prove boundary by acquiescence or agreement." In support, they cite *Shoemaker v. Houchen*, 994 S.W.2d 40, 45 (Mo.App. W.D.1999), for the proposition that "acquiescence and adverse

possession are separate legal doctrines, once an express agreement or acquiescence has been proved, possession thereafter becomes adverse, and the 10 year period for adverse possession begins to run." They also cite *Conduff v. Stone*, 968 S.W.2d 200, 204 (Mo.App. S.D.1998), for the statement that "if there is an express agreement setting a boundary line, possession by an adjoining landowner of property on his side of the agreed line *thenceforward* becomes adverse."

■■■■■ Here, however, the case was tried under the theory of adverse possession, not on the theory of an agreed boundary line or a boundary by acquiescence. Plaintiffs state in their brief that the trial court entered its judgment in favor of Defendants on "their [claim] for adverse possession ..." Appellate courts will not, on review, convict a trial court of error on issues that were not put before it to decide. *Thomas v. Lloyd*, 17 S.W.3d 177, 186 (Mo.App. S.D.2000). Issues raised for the first time on appeal are not preserved for review. *Id.* Plaintiffs' fifth point is denied.

In their sixth and final point, Plaintiffs contend that the trial court erred in entering its judgment because Defendants "did not prove the element of exclusivity or continuity in that [Plaintiffs] notified [Defendants] of their claim to the property and gave permission to continue using the property." In support, Plaintiffs rely primarily on the case of *Flowers*. There, the dispute was over the boundary line between tracts owned by plaintiffs and defendants. Unlike the instant case, in *Flowers* there was never a clear and definite understanding at the time plaintiffs or defendants acquired their properties as to the boundary line.[2] In *Flowers*, shortly after plaintiffs purchased their tract, they bulldozed a road along what they thought was their south boundary line. Thereafter, plaintiffs only possessory acts with respect to the disputed tract consisted of some efforts aimed at maintaining the dirt road as well as driving over it several times a year. *Id.* at 468. Some nine years later, plaintiffs built a fence paralleling the road on its southern side along what they believed to be the property line. Within two months defendants entered into the disputed tract and partially cut down the fence. The appellate court held that there was not sufficient evidence for the trial court to have found that the claimed adverse possession of the disputed tract by plaintiffs was "open and notorious." *Id.* at 470. It noted that for more than nine years after the cutting of the road and cutting of some timber in connection with that, the only possessory acts by plaintiffs were minimal and sporadic efforts to maintain the road and driving over it a few times each year. "Under the circumstances, these very limited activities do not amount to the kind of clearly obvious and conspicuous 'visible acts of ownership' which would be sufficient to put a reasonable property owner on notice that an adverse claim of ownership was being made by another." *Id.* at 470–71. The court said that "following their bulldozing the road and cutting some timber in 1984, not only did plaintiffs refrain for over nine years from doing anything whatsoever with respect to the disputed tract that could fairly be deemed 'open and notorious,' but when they finally did once again do something regarding the disputed tract that was open and notorious and would put a reasonable property own-

2.  In this case, the evidence was uncontroverted that Defendants and their predecessor in title (who also owned the tract later acquired by Plaintiffs) agreed on the location of the south boundary of the tract purchased by Defendants at the time of that purchase, and that Defendants immediately thereafter built the fence in question.

er on notice that an adversarial claim of ownership was being made namely, erecting the fence along [what plaintiffs believed to be the line] the defendants responded almost immediately to that act by cutting down the fence and disputing plaintiffs' claim." *Id.*

*Flowers* does not require a reversal here. The basis of Plaintiffs' point is specifically stated as the lack of proof concerning the elements of "exclusivity and continuity" to establish an adverse possession claim. *Flowers* says that "continuous" means without lapse, uninterrupted, for the entire statutory period. *Id.* at 470. It also says that "exclusive" possession means that the claimant must hold the land for himself only, and not for another, meaning that the claimant wholly excluded the owner from possession during the required period. *Id. Flowers*, in finding that the claimants' possession was not "open and notorious" for the prescriptive period, noted that the acts of the record owners in cutting the fence had terminated the "exclusive" hostile possession required to establish title by adverse possession. *Id.* at 471.

Unlike *Flowers*, in the instant case Defendants built the fence as soon as they purchased their tract, and the fence remained in place and intact from then until at least October 1999, approximately two years after the expiration of the prescriptive period.[3] According to *Flowers*, that act alone was an act that would put a reasonable property owner on notice that

an adversarial claim of ownership was being made. *Id.* at 471. Additionally, during the entire prescriptive period, Defendants ran cattle on their side of the fence, took fescue seed off that land, picked walnuts, fertilized the land, cut and baled hay, and repaired the fence in its original location.

Plaintiffs, however, liken sending the letter from the attorney and the survey to Defendants with the cutting of the fence in *Flowers*. We disagree. The letter was addressed to Plaintiffs, not Defendants. It constituted advice their attorney gave *them* concerning the survey and the fence. It did not necessarily constitute an affirmative statement from Plaintiffs to Defendants simply because a copy of it was sent to Defendants. We are unable to conclude that the trial court was required to find that the act of sending the letter to Defendants was the equivalent of cutting the fence in *Flowers* as argued by Plaintiffs. Therefore, Point Six is denied.

The judgment of the trial court is affirmed.

PREWITT, J., and RAHMEYER, J., concur.

---

**3.** In October 1999, Plaintiffs created a new dam for a pond that had previously been divided by the fence. In doing so, they had a bulldozer push up a new dam on their side of the fence, and as a result, some of the dirt from the excavation covered part of the original fence. Plaintiff Underwood then put in new fence in the original location where the dirt had covered part of the preexisting fence.